# Supreme Court of Florida

_____

No. SC13-144
_____

**CITIZENS OF THE STATE OF FLORIDA, etc.**
Appellant,

vs.

**FLORIDA PUBLIC SERVICE COMMISSION, et al.**
Appellees.

[August 28, 2014]

LABARGA, C.J.

This case is before the Court on appeal from a decision of the Florida Public Service Commission (the Commission) relating to the rates of a public utility providing electric service. See In re Petition of Fla. Power & Light Co., Docket No. 120015-EI, Order No. PSC-13-0023-S-EI, 2013 WL 209584 (F.P.S.C. Jan. 14, 2013). We have jurisdiction. See art. V, § 3(b)(2), Fla. Const. Florida Power & Light (FPL) filed an application for a rate base increase pursuant to section 366.06(1), Florida Statutes (2012). Three intervenors to the proceedings below— the Florida Industrial Power Users Group (FIPUG), South Florida Hospital and Healthcare Association (SFHHA), and Federal Executive Agencies (FEA)—and

FPL reached a negotiated settlement agreement, and the Commission approved the agreement to resolve FPL's application for a rate base increase despite Citizens of the State of Florida's (Citizens) objection to the Commission's consideration and approval of the negotiated settlement agreement prior to and during evidentiary hearings pertaining exclusively to the settlement agreement. For the reasons explained below, we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

On March 19, 2012, FPL filed an application with the Commission for a permanent increase of base rates of $516.5 million to satisfy revenue requirements and a proposed return on equity (ROE) of 11.5% beginning in January 2013, and a generation base revenue adjustment (GBRA) of $173.9 million for the Cape Canaveral modernization project beginning in the summer of 2013. With its petition, FPL filed its minimum filing requirements (MFR) and the prefiled testimony and exhibits of fifteen witnesses who addressed FPL's request.

Citizens, represented by the Office of Public Counsel (OPC),[1] filed its notice of intervention on March 19, 2012. Other affected parties also filed petitions for leave to intervene, which were granted in separate orders. On July 2, 2012, Citizens filed the testimony of seven expert witnesses. These witnesses opined that

---

1. This opinion refers to Citizens and the OPC interchangeably, in particular where the arguments relate to the OPC's authority in rate cases.

no rate increase was warranted and that the Commission should require FPL to reduce its rates. Other intervenors, including FIPUG, SFHHA, and FEA, submitted testimony opposing FPL's request. Between the March filing and July 2012, FPL began negotiating a settlement with FEA, FIPUG, and SFHHA.[2] In July, FPL first presented Citizens with the negotiated settlement. Shortly thereafter, FPL filed the testimony of seventeen rebuttal witnesses.

On August 14, 2012, a prehearing conference was conducted and 193 disputed issues of fact were identified in FPL's petition. On August 15, 2012, the signatories to the settlement agreement—FEA, FIPUG, SFHHA, and FPL—filed joint motions to suspend the procedural schedule and approve the settlement agreement. The proposed settlement agreement set an ROE of 10.7% and an initial rate base increase of $378 million annually, scheduled to take effect in January 2013. Further, although not part of FPL's initial petition, FPL would receive a GBRA for the Cape Canaveral modernization project and receive GBRAs of $236 million and $217.9 million, respectively, for its Riviera Beach and Port Everglades modernization projects upon entering commercial operations in 2014 and 2016.

_____

2. Citizens claims that it was not informed of the negotiations and was not invited to participate, despite sending a message to FPL in March indicating a desire to negotiate. FPL claims it met with Citizens in January 2012 to outline the magnitude of the increase it would seek and also met in March, at which time Citizens indicated a desire to review the filing materials before negotiating. Ultimately, as discussed below, Citizens was extensively involved in this rate proceeding despite this "lack of an invitation to negotiate."

The agreement also gave FPL the ability to amortize up to $209 million of its accumulated fossil plant dismantlement reserve during its four-year term and postpone the periodic analysis of the status of the fossil dismantlement reserve balance that otherwise would be required by the Commission's rule, unless the Commission ordered otherwise. Although Citizens and the signatories each requested a suspension of the hearing schedule to consider the settlement agreement on the merits, the Commission denied the requests and proceeded with the hearing as scheduled on August 20.

A full evidentiary hearing was held on the rate case on August 20-24 and August 27-31, 2012. Prior to the hearing, the parties filed direct and rebuttal testimony of all witnesses, along with the exhibits they intended to sponsor. They also engaged in extensive discovery and filed prehearing statements. A prehearing conference was held on August 14, 2012, and a prehearing order was issued on August 17, 2012. On August 30, 2012, during the rate case hearing, the Commission announced on the record, in conformity with an order establishing procedure on August 27, 2012, that the hearing would reconvene on September 27, 2012, to discuss the proposed settlement agreement.

At the September 27, 2012, hearing, the Commission determined that the proposed settlement agreement raised five new disputed issues of material fact supplemental to the disputed issues presented in the initial petition. The issues

were: (1) whether the GBRAs for the Cape Canaveral, Riviera Beach, and Port Everglades modernization projects were in the public interest; (2) whether the amortization of a portion of FPL's fossil dismantlement reserve was in the public interest; (3) whether the postponement of filing depreciation or dismantlement studies by FPL was in the public interest; (4) whether the incentive mechanism for gain sharing between customers and FPL was in the public interest; and (5) whether the settlement agreement was in the public interest. As a result, the Commission elected to schedule a hearing to take additional testimony limited to the five new disputed issues of fact. In an order issued on October 3, 2012, the hearing was scheduled for November 19-21, 2012. The parties filed direct and rebuttal testimony of all witnesses as to the settlement issues, along with the exhibits they intended to sponsor. The parties also engaged in discovery. The formal hearing reconvened on November 19, 2012, and concluded on November 20, 2012. Post-hearing briefs were filed on November 30, 2012.

On December 13, 2012, the Commission held a special agenda conference to rule upon the merits of the proposed settlement agreement. After the Commission voiced its concern with a few items, the Commission recessed to give all the parties an opportunity to engage in further settlement negotiations.

When presented with the modified settlement agreement, the Commission found that it satisfied all of the Commission's concerns and that it established fair,

just, and reasonable rates and that it was in the public interest. The final order memorialized this finding on January 14, 2013, and incorporated the approved settlement. The final order also listed the major differences between the proposed agreement and the modified agreement. However, the 193 disputed issues of fact identified in FPL's petition were not entirely addressed by the Commission in its final order. The details of the procedures followed by the Commission, testimony and evidence introduced at the hearings, and the Commission's final order that are relevant to the issues raised on appeal will be discussed below.

Citizens now appeals the Commission's decision and contends that: (1) the Commission erred by approving a non-unanimous negotiated settlement agreement over Citizens' objection; (2) the Commission violated Citizens' due process rights by creating a rushed hearing track to consider the settlement agreement; and (3) the Commission's decision that the settlement agreement and its terms result in rates that are fair, just, reasonable, and in the public interest is not supported by competent, substantial evidence.

## ANALYSIS

### Standard of Review

As we have consistently held, when reviewing an order of the Commission, this Court affords great deference to the Commission's findings. S. Alliance for Clean Energy v. Graham, 113 So. 3d 742, 752 (Fla. 2013) (noting that this Court

- 6 -

has repeatedly held that "[the Commission's] orders, and concomitant interpretations of statutes and legislative policies that it is charged with enforcing, are entitled to great deference."). "Commission orders come to this Court clothed with the presumption that they are reasonable and just." W. Fla. Elec. Coop. Ass'n, Inc. v. Jacobs, 887 So. 2d 1200, 1204 (Fla. 2004) (citing Gulf Coast Elec. Coop., Inc. v. Johnson, 727 So. 2d 259, 262 (Fla. 1999)); see also BellSouth Telecomm., Inc. v. Johnson, 708 So. 2d 594, 596 (Fla. 1998) (noting that Commission orders carry a presumption of validity). Moreover, "[t]o overcome these presumptions, a party challenging an order of the Commission on appeal has the burden of showing a departure from the essential requirements of law and the legislation controlling the issue, or that the findings of the Commission are not supported by competent, substantial evidence." S. Alliance for Clean Energy, 113 So. 3d at 752 (quoting Crist v. Jaber, 908 So. 2d 426, 430 (Fla. 2005) (citing Jacobs, 887 So. 2d at 1204)). We now turn to Citizens' first claim on appeal.

## I. Whether the Commission is Authorized to Approve a Non-unanimous Settlement Agreement over Citizens' Objection

Citizens' first issue presented for review is whether the Commission erred in approving the revised stipulation and settlement between FPL, FIPUG, SFHHA,

and FEA over Citizens' continued objections and without its involvement.[3] Specifically, Citizens claims that the Commission's approval of the settlement agreement was akin to the procedural violations present in Citizens v. Mayo, 333 So. 2d 1 (Fla. 1976), where the OPC was denied from participating fully in a public hearing that the Commission conducted on an aspect of a utility's rate increase request. In support, Citizens cites to section 350.0611, Florida Statutes, the OPC's enabling legislation, and this Court's opinions in Mayo and South Florida Hospital and Healthcare Ass'n v. Jaber, 887 So. 2d 1210 (Fla. 2004). Citizens also argues that the final order is insufficient because the Commission did not make findings regarding Citizens' objections and did not request a staff review of the issues. Thus, this Court must determine whether the fairness of the proceedings or the correctness of the Commission's action was impaired by a material error in procedure or a failure to follow prescribed procedure, or whether the Commission's exercise of discretion was outside the range of discretion delegated to it. See §§ 120.68(7)(c) and (7)(e)1., Fla. Stat. (2012).

As more fully explained below, Citizens' argument regarding the Commission's authority to approve a settlement agreement objected to by the OPC is without merit because the Commission independently determines rates for

_____

3. Citizens framed this issue as a question of statutory interpretation of section 350.0611, Florida Statutes (2012), which details the OPC's duties and powers.

- 8 -

utilities, the Commission is authorized by statute to resolve rate-making proceedings by approving negotiated settlements, and nothing in the language of section 350.0611 or this Court's holdings in Mayo and Jaber supports Citizens' position that the Commission is precluded by law from authorizing a non-unanimous settlement where the OPC objects to the terms of the settlement. Citizens' argument regarding the sufficiency of the Commission's findings in the final order is also without merit because, although it may be the better practice, the Commission is not required by statute or case law to address each issue of disputed fact in its final order.

Pursuant to section 350.001, Florida Statutes, titled "Legislative intent," the Commission is an arm of the legislative branch and shall perform its duties independently. See Pub. Serv. Comm'n v. Bryson, 569 So. 2d 1253, 1254 (Fla. 1990) (noting that "the legislature granted the [Commission] exclusive jurisdiction over matters respecting the rates and service of public utilities."); Chiles v. Pub. Serv. Comm'n Nominating Council, 573 So. 2d 829, 832 (Fla. 1991) ("[R]ate-making by the [Commission] is a legislative function."). Further, section 366.04, Florida Statutes, provides the Commission with jurisdiction to regulate and supervise each public utility with respect to its rates and service, and prescribe a rate structure for all electric utilities. § 366.04(1)-(2), Fla. Stat. (2012); see also § 366.05(1) ("In the exercise of such jurisdiction, the commission shall have power

to prescribe fair and reasonable rates and charges . . . .").  Thus, the plain language of the statutes clearly provides that the Commission independently determines rates of public utilities subject to the conditions set forth in chapter 366; the Commission's authority to fix fair, just, and reasonable rates pursuant to section 366.06(1), Florida Statutes, is not conditioned on the OPC's approval or absence of the OPC's objections.[4]

Second, pursuant to section 120.57(4), Florida Statutes (2012), informal disposition of the rate proceeding may be made by stipulation, agreed settlement, or consent order "[u]nless precluded by law."  Chapters 350 and 366, pertaining to the Commission and public utilities respectively, do not prohibit the Commission from approving a negotiated settlement to resolve a rate-making proceeding.  Further, as discussed below, this Court reviewed and affirmed a Commission order approving a negotiated settlement without an evidentiary hearing in Jaber.  Jaber, 887 So. 2d at 1212.  Thus, the Commission is not clearly precluded by statute or case law from approving non-unanimous settlements.  Citizens, however, claims that language in this Court's holding in Mayo, noting that "special conditions

---

4.  "In fixing fair, just, and reasonable rates for each customer class, the commission shall, to the extent practicable, consider the cost of providing service to the class, as well as the rate history, value of service, and experience of the public utility; the consumption and load characteristics of the various classes of customers; and public acceptance of rate structures."  § 366.06(1), Fla. Stat. (2012).

pertain" when the OPC intervenes on behalf of Citizens in a rate-making proceeding, and language in section 350.0611 operate to preclude the Commission from approving any settlement to which the OPC actively objects.

Section 350.0611 is the OPC's enabling statute and provides that the OPC's powers include, but are not limited to, the following:

(1) To recommend to the commission or the counties, by petition, the commencement of any proceeding or action or to appear, in the name of the state or its citizens, in any proceeding or action before the commission or the counties and urge therein any position which he or she deems to be in the public interest, whether consistent or inconsistent with positions previously adopted by the commission or the counties, and utilize therein all forms of discovery available to attorneys in civil actions generally, subject to protective orders of the commission or the counties which shall be reviewable by summary procedure in the circuit courts of this state;

(2) To have access to and use of all files, records, and data of the commission or the counties available to any other attorney representing parties in a proceeding before the commission or the counties;

(3) In any proceeding in which he or she has participated as a party, to seek review of any determination, finding, or order of the commission or the counties, or of any hearing examiner designated by the commission or the counties, in the name of the state or its citizens;

(4) To prepare and issue reports, recommendations, and proposed orders to the commission, the Governor, and the Legislature on any matter or subject within the jurisdiction of the commission, and to make such recommendations as he or she deems appropriate for legislation relative to commission procedures, rules, jurisdiction, personnel, and functions; and

(5) To appear before other state agencies, federal agencies, and state and federal courts in connection with matters under the jurisdiction of the commission, in the name of the state or its citizens.

§ 350.0611, Fla. Stat. (2012). It is notable that the Commission's enabling statute is also part of chapter 350, Florida Statutes. " '[R]elated statutory provisions must be read together to achieve a consistent whole.' " Raymond James Fin. Serv., Inc. v. Phillips, 126 So. 3d 186, 191 (Fla. 2013) (quoting Heart of Adoptions, Inc. v. J.A., 963 So. 2d 189, 199 (Fla. 2007)). Further, " '[w]here possible, courts must give full effect to all statutory provisions and construe related statutory provisions in harmony with one another.' " Phillips, 126 So. 3d at 192 (quoting Heart of Adoptions, 963 So. 2d at 199). The Legislature enacted section 350.001, titled "Legislative intent," with specific language providing that the Commission perform its duties independently and also enacted sections 366.04(1) and 366.06(1), which provide that the Commission has exclusive jurisdiction to fix fair, just, and reasonable rates of electric utilities. Thus, although section 350.0611 does not contain an exhaustive list of the OPC's specific powers and section 366.01, Florida Statutes (2012), provides that chapter 366 shall be liberally construed for the accomplishment of protecting the public welfare, adoption of OPC's argument that its powers include the ability to preclude the Commission from approving a settlement agreement over the OPC's objection would render the statutory language in chapters 350 and 366 inconsistent.

In addition, this Court's holding in Mayo was not intended to extend to the factual circumstances present here. In Mayo, Gulf Power filed a petition for a

permanent rate increase and the OPC intervened on behalf of Citizens. <u>Mayo</u>, 333

So. 2d at 2-3. The Commission scheduled and held hearings over two days. The

evidence presented to the Commission included direct testimony from Gulf Power

in support of its rate increase requests; clarifying questions from the Commission's

staff, from the OPC, public counsel, and from other intervenors with respect to

Gulf Power's testimony and evidence; and testimony and evidence from public

witnesses both for and against the proposed rate increases. The OPC, however, did

not cross-examine Gulf Power witnesses or present any direct evidence

contradictory to the data supplied by Gulf Power because it indicated it was not

prepared due to the Commission's notice of hearing specifying such facets of the

hearing would be held at a later date. Shortly thereafter, the Commission issued an

order granting Gulf Power an interim rate increase and then a permanent rate

increase at a later date. The OPC was never provided an opportunity to introduce

evidence. This Court in <u>Mayo</u>, explaining its rationale for why error had been

committed, noted that:

> special conditions pertain in cases where public counsel has
> intervened. This is a consequence of the statutory nexus between the
> file and suspend procedures and the role prescribed for public counsel
> in rate regulation. Public counsel was authorized to represent the
> citizens of the State of Florida in rate proceedings of this type. That
> office was created with the realization that the citizens of the state
> cannot adequately represent themselves in utility matters, and that the
> rate-setting function of the Commission is best performed when those
> who will pay utility rates are represented in an adversary proceeding
> by counsel at least as skilled as counsel for the utility company. The

office of public counsel was created by the same enactment which brought the utilities accelerated rate relief.  Under these circumstances, the Commission cannot schedule a "public hearing" and preclude public counsel, the public's advocate, from acting to protect the public's interest.

Id. at 6-7 (footnote omitted).  Accordingly, this Court held that "[b]y foreclosing public counsel's effective participation in the interim rate process after having assured it, the procedures used by the Commission to grant interim rate relief in this case were plainly improper."[5]  Id. at 7.  This Court's use of this language was intended to ensure that the OPC is fully involved (i.e., not precluded from participation in a hearing) when the public's interest is at issue in an adversary

---

5.  Although this Court held that the Commission's procedures in Mayo were "plainly improper," the Court also noted the following:

Since the defect is not of constitutional significance, and despite the fact that public counsel was misled, we believe that it would be unduly harsh to punish Gulf Power by directing a refund of charges collected between December 30, 1974 and March 2, 1975.  The Commission's procedural defect does not alone establish a failure by Gulf Power to justify the interim award.  The test to be met is and was whether, from the record, Gulf Power developed substantial and competent evidence to sustain the interim award after the Commission first rejected its proposed rate increase as "unjust, unreasonable, unduly discriminatory or preferential, or otherwise unlawful."  On this point we simply lack sufficient information to proceed.

Mayo, 333 So. 2d at 7-8 (footnote omitted).  Ultimately, however, the Court remanded the case for further action because there were inadequate findings in the Commission's orders and there was a "material error in procedure" which "affected both the fairness and the correctness of the interim rate proceeding."  Id. at 8-9.

- 14 -

proceeding—it is not a broad-based proclamation that the OPC is a "special intervenor" deserving of additional authority in a rate-setting context. Moreover, the factual circumstances here satisfy this Court's reasoning in <u>Mayo</u>.

Here, as discussed more at length below, the OPC fully represented Citizens in ten days of hearings regarding FPL's petition for a rate increase and also fully participated in hearings regarding the proposed settlement agreement by submitting prefiled testimony, participating in discovery, presenting evidence in opposition to the settlement agreement, and filing post-hearing briefs. Thus, the OPC was not precluded from zealously representing Citizens, but was provided multiple opportunities to urge the public's position on FPL's petition and subsequent settlement agreement.

Likewise, this Court's holding in <u>Jaber</u> does not support Citizens' argument. In <u>Jaber</u>, this Court found that the Commission did not err by approving a non-unanimous settlement agreement without conducting an evidentiary hearing. <u>See</u> <u>id.</u>, 887 So. 2d at 1213 (holding that the Commission's approval of a non-unanimous settlement agreement did not violate intervenor's due process rights because "the record shows that the appellant presented arguments in opposition to the settlement during the agenda conference" in which the appellant was allowed thirty minutes to present its views in opposition to the settlement agreement). Further, this Court's reasoning in <u>Jaber</u> did not rely on or even discuss the OPC's

participation or agreement to the non-unanimous settlement as a factor in holding that the Commission did not have to conduct an evidentiary hearing pursuant to the circumstances in <u>Jaber</u>. Accordingly, <u>Jaber</u> does not support Citizens' argument that the OPC's role in rate-setting proceedings entitles it to prevent the Commission from approving a non-unanimous settlement agreement.

Third, the OPC's argument that "[u]nless the Court reverses the Final Order, the effect will be to marginalize the participation of 'the public's advocate . . .' as the petitioning utility could bypass [the] OPC's opposition through the expedient of offering a revenue concession . . . to a willing intervenor . . ." is without merit. Ultimately, the Commission's actions are conditioned by statute (rates set must be fair, just, and reasonable) and its actions are subject to judicial review—the Commission cannot simply accept any settlement agreement devoid of record support as in the public interest. Moreover, none of the actions taken by the Commission in this case will preclude the OPC from fully representing the public's interest in future cases because the OPC was able to "urge therein any position which he or she deem[ed] to be in the public interest" in this rate-making proceeding.

Citizens also argues that the factual findings in the final order were insufficient because the Commission did not explain why it overruled the OPC's objections to consideration of the settlement and did not resolve every disputed

issue of fact. Further, amicus curiae AARP argues that approval of the settlement without staff review is an improper abdication of the Commission's obligations. These arguments are without merit. Section 120.569(2)(l), Florida Statutes (2012), provides that "the final order in a proceeding which affects substantial interests must be in writing and include findings of fact, if any, and conclusions of law separately stated. . . ." Here, the Commission's final order discusses the major elements of the settlement presented for its review on FPL's motion to approve the settlement agreement. The Commission then lists how the terms of the settlement agreement changed after it noted its concerns to the intervenors and FPL. Further, the Commission explained why the settlement agreement was in the public interest. Thus, although it may be the better practice to resolve every factual dispute in the final order, the Commission is not required by statute or case law to address each issue of disputed fact in its final order, and the final order otherwise satisfies section 120.569(2)(l). Regarding the argument that the Commission abdicated its obligations, section 350.06(3), Florida Statutes (2012), allows the Commission to "employ . . . professional personnel . . ." but does not require staff review and recommendations prior to ruling on cases pending before it. Thus, the Commission did not err by failing to submit the settlement agreement to its staff for review. Accordingly, we affirm the Commission's final order because Citizens has not demonstrated that the Commission violated the essential requirements of

- 17 -

law or committed a material error in procedure by approving the negotiated settlement agreement over Citizens' active objection. We now turn to Citizens' claim that its due process rights were violated.

**II. Whether the Commission Violated Citizens' Due Process Rights by Considering FPL's Proposed Settlement Agreement Containing Major Elements not Present in FPL's Petition for Base Rate Increases**

Citizens claims that the Commission failed to afford due process to the opponents of the settlement agreement by creating a rushed hearing schedule to discuss settlement issues that were not present in FPL's rate increase petition and not accompanied by a test-year notification letter, MFRs, testimony, or exhibits. Specifically, Citizens argues that FPL's settlement agreement included new rate base increases, $209 million of earnings enhancements, and FPL-favoring policy initiatives. Thus, this Court must determine whether the fairness of the proceedings or the correctness of the Commission's action was impaired by a material error in procedure or a failure to follow prescribed procedure, or whether the Commission's exercise of discretion was outside the range of discretion delegated to it. §§ 120.68(7)(c) & (7)(e)1., Fla. Stat. (2012). As discussed below, we affirm the Commission's final order because Citizens' argument is without merit. We first address the due process requirements applicable to this rate proceeding.

A. <u>Due Process Requirements</u>

As this Court has noted in the past, "[t]he extent of procedural due process protections varies with the character of the interest and nature of the proceeding involved." <u>Hadley v. Dep't of Admin.</u>, 411 So. 2d 184, 187 (Fla. 1982) (citing <u>In Interest of D.B.</u>, 385 So. 2d 83, 89 (Fla. 1980)). Although this Court has stated that there is no single test to determine whether the requirements of due process have been met, <u>see</u> <u>Hadley</u>, 411 So. 2d at 187, "[t]he fundamental requirements of due process are satisfied by reasonable notice and a reasonable opportunity to be heard." <u>Fla. Pub. Serv. Comm'n v. Triple "A" Enter., Inc.</u>, 387 So. 2d 940, 943 (Fla. 1980) (citing <u>Ryan v. Ryan</u>, 277 So. 2d 266 (Fla. 1973); <u>Powell v. State of Ala.</u>, 287 U.S. 45 (1932); <u>Dohany v. Rogers</u>, 281 U.S. 362 (1930)). Further, due process cannot be compromised "on the footing of convenience or expediency." <u>United Tel. Co. of Fla. v. Beard</u>, 611 So. 2d 1240, 1243 (Fla. 1993) (quoting <u>Fla. Gas Co. v. Hawkins</u>, 372 So. 2d 1118, 1121 (Fla. 1979)).

Ultimately, however, "[t]he legislature may determine by what process and procedure legal rights may be asserted and determined provided that the procedure adopted affords reasonable notice and a fair opportunity to be heard before rights are decided." <u>Peoples Bank of Indian River Cnty. v. State, Dep't of Banking & Fin.</u>, 395 So. 2d 521, 524 (Fla. 1981). In the administrative arena, due process requirements are found in chapter 120, Florida Statutes, the Florida Administrative

Procedure Act ("APA").[6]  Further, additional procedural requirements specific to the Commission and public utilities are provided in chapter 366, Florida Statutes, and the Florida Administrative Code.

The provisions of section 120.569, Florida Statutes (2012), which provide the procedure to be followed in determining the substantial interests of a party, and section 120.57, Florida Statutes (2012), which prescribes procedures for fact-finding hearings, are pertinent to this Court's review.  See Sch. Bd. of Palm Beach Cnty. v. Survivors Charter Sch., Inc., 3 So. 3d 1220, 1231 (Fla. 2009).  Pursuant to section 120.569(1), the provisions of section 120.569 "apply in all proceedings in which the substantial interests of a party are determined by an agency. . . ."  In the event that there are disputed issues of material fact to be determined, an adversarial hearing must be provided under section 120.57, after reasonable notice is given not less than fourteen days before the hearing.  § 120.569(2)(b), Fla. Stat. (2012); see also Survivors Charter Sch., 3 So. 3d at 1231.  The notice must contain the time, place, and nature of the hearing and the legal authority under which the hearing is to be held.

_____

6.  The APA "was intended to simplify the administrative process. . . , thereby insuring that the public would receive due process and significantly improved fairness of treatment. . . ."  Sch. Bd. of Palm Beach Cnty. v. Survivors Charter Sch., Inc., 3 So. 3d 1220, 1231 (Fla. 2009) (quoting Machules v. Dep't of Admin., 523 So. 2d 1132, 1136-37 (Fla. 1988)).

Further, section 120.569(1) provides that additional procedural requirements listed in section 120.57(1) apply whenever the proceeding involves a disputed issue of material fact. Section 120.57(1)(b) provides:

> All parties shall have an opportunity to respond, to present evidence and argument on all issues involved, to conduct cross-examination and submit rebuttal evidence, to submit proposed findings of facts and orders, to file exceptions to the presiding officer's recommended order, and to be represented by counsel or other qualified representative. When appropriate, the general public may be given an opportunity to present oral or written communications. If the agency proposes to consider such material, then all parties shall be given an opportunity to cross-examine or challenge or rebut the material.

Section 120.57(4) also provides that "informal disposition may be made of any proceeding by stipulation, agreed settlement, or consent order" unless precluded by law. As this Court stated in AmeriSteel Corp. v. Clark, in the context of utility service agreements to resolve territorial disputes, "[t]he legal system favors the settlement of disputes by mutual agreement between the contending parties" and "[t]his general rule applies with equal force in utility service agreements." Ameristeel Corp. v. Clark, 691 So. 2d 473, 478 (Fla. 1997) (quoting Utilities Comm'n of New Smyrna Beach v. Fla. Pub. Serv. Comm'n, 469 So. 2d 731, 732 (Fla. 1985)). Nothing in our precedent or the language of the statute suggests that this general rule does not also apply in rate-setting cases. Finally, section 120.68(1), Florida Statutes (2012), also provides that "[a] party who is adversely affected by final agency action is entitled to judicial review."

Chapter 366 also provides procedures for fixing and changing rates of public utilities. Section 366.06(1) provides in relevant part that "[a]ll applications for changes in rates shall be made to the commission in writing under rules and regulations prescribed, and the commission shall have the authority to determine and fix fair, just, and reasonable rates that may be requested, demanded, charged, or collected by any public utility for its service. . . ." Further, section 366.06(1) provides that the Commission, in fixing rates, "shall . . . consider the cost of providing service to the class, as well as the rate history, value of service, and experience of the public utility; the consumption and load characteristics of the various classes of customers; and public acceptance of rate structures." § 366.06(1), Fla. Stat. (2012).

The Florida Administrative Code also contains procedural rules for rate-making proceedings. Specifically, rules 25-6.140 and 25-6.043 set forth the initial requirements for a utility's application for a change in rates. Rule 25-6.140 provides the following:

> (1) <u>At least 60 days prior to filing a petition for a general rate increase</u>, a company shall notify the Commission in writing of its selected test year and filing date. This notification shall include:
> (a) An explanation for requesting the particular test period. If a historical test year is selected, there shall be an explanation of why the historical period is more representative of the company's operations than a projected period. If a projected test year is selected, there shall be an explanation of why the projected period is more representative than a historical period;

(b) An explanation, including an estimate of the impact on revenue requirements, of the major factors which necessitate a rate increase;

(c) A statement describing the actions and measures implemented by the company for the specific purpose of avoiding a rate increase; and

(d) A statement that the utility either is or is not requesting that the Commission process its petition for rate increase using the proposed agency action process authorized in Section 366.06(4), F.S.

(2) In the event that a test year other than one based on a calendar year or the company's normal fiscal year is selected, the notification shall include an explanation of why the chosen test year period is more appropriate.

(3) If the company cannot meet its filing date, it shall notify the Commission in writing before the due date and include an explanation of why it will not meet the filing date. The company shall include a revised filing date.

Fla. Admin. Code R. 25-6.140 (emphasis added). Rule 25-6.043 also provides the following filing instructions:

(1) General Filing Instructions.

(a) The petition under Sections 366.06 and 366.071, F.S., for adjustment of rates must include or be accompanied by:

1. The information required by Commission Form PSC/ECR/011-E (2/04), entitled "Minimum Filing Requirements for Investor-Owned Electric Utilities" which is incorporated into this rule by reference. The form may be obtained from the Commission's Division of Economic Regulation.

2. The exact name of the applicant and the address of the applicant's principal place of business.

3. Copies of prepared direct testimony and exhibits for each witness testifying on behalf of the Company.

(b) In compiling the required schedules, a company shall follow the policies, procedures and guidelines prescribed by the Commission in relevant rules and in the company's last rate case or in a more recent rate case involving a comparable utility. These schedules shall

be identified appropriately (e.g., Schedule B-1 would be designated Company Schedule B-1 – Company basis).

(c) Each schedule shall be cross-referenced to identify related schedules as either supporting schedules or recap schedules.

(d) Each page of the filing shall be numbered on 8 1/2" × 11" inch paper. Each witness' prefiled testimony and exhibits shall be on numbered pages and all exhibits shall be attached to the proponent's testimony.

(e) Except for handwritten official company records, all data in the petition, testimony, exhibits and minimum filing requirements shall be typed.

(f) Each schedule shall indicate the name of the witness responsible for its presentation.

(g) All schedules involving investment data shall be completed on an average investment basis. Unless a specific schedule requests otherwise, average is defined as the average of 13 monthly balances.

(h) Twenty-one copies of the filing, consisting of the petition and its supporting attachments, testimony, and exhibits, shall be filed with the Office of Commission Clerk.

(i) Whenever the company proposes any corrections, updates or other changes to the originally filed data, 21 copies shall be filed with the Office of Commission Clerk with copies also served on all parties at the same time.

(2) Commission Designee: The Director of the Division of Economic Regulation shall be the designee of the Commission for purposes of determining whether the utility has met the minimum filing requirements imposed by this rule. <u>In making this determination, the Director shall consider whether information that would have been provided in a particular schedule required by this rule has been provided to the same degree of detail in another required schedule that the utility incorporates by reference.</u>

Fla. Admin. Code R. 25-6.043 (emphasis added). Further, pursuant to section

366.076(2), Florida Statutes (2012), the Commission has the authority to adopt

rules for the determination of rates in full revenue requirement proceedings. These

rules provide for adjustments of rates based on revenues and costs during the

period new rates are to be in effect and for incremental adjustments in rates for subsequent periods. Pursuant to this authority, the Commission adopted Florida Administrative Code rule 25-6.0425, which provides that "[t]he Commission may in a full revenue requirements proceeding approve incremental adjustments in rates for periods subsequent to the initial period in which new rates will be in effect."[7]

The Florida Administrative Code also contains a rule governing the procedures for disposition of a motion. Under Florida Administrative Code rule 28-106.204(1), "[t]he presiding officer shall conduct such proceedings and enter such orders as are deemed necessary to dispose of issues raised by [motions]." Further, "[w]ritten motions will normally be disposed of after the response period has expired, based on the motion, together with any supporting or opposing memoranda." The response period in this rule is seven days. Rule 28-106.211, Florida Administrative Code, also allows the presiding officer to issue orders

---

7. Although the plain language of section 366.076(2) and rule 25.06425 would seemingly be applied to GBRAs as well as "subsequent year adjustments," the Commission has not utilized this rule for GBRAs. This Court, however, in approving the Commission's decision to grant a subsequent year adjustment, stated, "At the heart of this dispute is the authority of [the Commission] to combat 'regulatory lag' by granting prospective rate increases which enable the utilities to earn a fair and reasonable return on their investments. We long ago recognized that rates are fixed for the future and that it is appropriate for [the Commission] to recognize factors which affect future rates and to grant prospective rate increases based on these factors." Floridians United for Safe Energy, Inc. v. Pub. Serv. Comm'n, 475 So. 2d 241, 242 (Fla. 1985).

- 25 -

necessary to effectuate discovery, to prevent delay, and to promote the just, speedy, and inexpensive determination of the case.

As noted in the discussion below, the Commission followed the procedures outlined in the statutes and rules, and provided Citizens with adequate notice and the opportunity to be heard. Accordingly, we affirm the Commission's final order.

### B. Relevant Procedure Followed Below

### 1. Initial Filing

FPL filed its application for a change in rates on March 19, 2012, more than sixty days after January 17, 2012, when FPL notified the Commission of its intent to submit such application. FPL's filing indicated that the projected test year for the petition was 2013 and requested authority to increase its base rates and charges to generate an additional $516.5 million of revenues annually with an 11.5% ROE. FPL also asked for authority to increase its base rates by an additional $173.9 million annually when its Cape Canaveral generation project enters commercial service in the summer of 2013. With its petition, FPL submitted the MFRs as well as the prefiled testimony and exhibits of fifteen witnesses.

### 2. Order Establishing Procedure

Shortly thereafter on March 26, 2012, the Commission issued an order establishing the procedure for the rate-making proceedings. The deadline for discovery was set for August 13, 2012, the prehearing conference was scheduled

for August 14, 2012, and the evidentiary hearing on the petition was scheduled for a two-week period beginning August 20, 2012. Thus, in regard to the evidentiary hearing for the petition, Citizens received adequate notice of the hearing pursuant to section 120.569(2)(b).

From March to mid-August 2012, Citizens served fourteen sets of interrogatories and thirteen requests to produce documents on FPL and participated in numerous depositions. On July 2, 2012, Citizens filed the testimony of seven expert witnesses, who addressed various aspects of FPL's March filing, and argued that FPL should actually reduce its existing rates. FPL presented Citizens with a completed and signed settlement agreement in the middle of July.

### 3. Evidentiary Hearing and Joint Motions to Approve Settlement and Suspend Procedural Schedule

On August 15, 2012, the signatories to the negotiated settlement agreement filed a joint motion to approve settlement agreement and a joint motion to suspend procedural schedule. Anticipating that there would not be a need for a hearing if the Commission granted their motion, the signatories requested the Commission to suspend all remaining portions of the procedural schedule. Citizens opposed the joint motion to approve the settlement agreement, but not the joint motion to suspend the procedural schedule, arguing that the hearing could not proceed without the Commission conducting a full analysis of the settlement agreement. The joint motion to suspend the procedural schedule was denied in part based on

- 27 -

the difficulty of rescheduling a complex hearing if the settlement agreement was not approved. The hearing commenced as scheduled on August 20, 2012.

At the start of the hearing, Citizens orally moved for reconsideration of the order denying the joint motion to suspend the procedural schedule and requested that the procedural schedule be suspended because Citizens wished to "rid the process of the undue influence of the FPL document . . . on the scheduled hearing."[8] Argument was heard on the motion from all parties, and the motion was denied. Citizens then moved to dismiss the proposed settlement agreement, set the motion to approve it for expedited oral argument in advance of the rate case hearing, or dismiss the petition for rate increase.[9] The Commission denied the motion and voted to proceed with the rate case hearing. Evidence was thus taken in the rate case over the course of ten days.

On August 27, 2012, the Commission revised the order establishing procedure to set the procedural schedule for the Commission's consideration of the proposed settlement agreement. Although the order did not provide a specific date

---

8. The arguments raised here on appeal were also raised in this oral motion.

9. Citizens specifically argued, "If the Commission denies Citizens' Motion to Dismiss the purported FPL settlement agreement, then Citizens request[s] that it be allowed to be heard on the merits of the purported FPL settlement agreement prior to the hearing. Citizens intend[s] to file their substantive response to the Motion to Approve the Settlement on Tuesday, August 21, 2012, and will be prepared to be heard on oral arguments on Wednesday, August 22, 2012."

and time to consider the joint motion to approve the settlement agreement, the order provided that at the conclusion of the evidentiary portion of the rate case hearing, the Commission would recess until the date and time announced to reconvene the hearing to consider the motion to approve the settlement agreement. In short, the hearing to consider the settlement agreement was considered part of the hearing on the petition.

The order stressed that the hearing to consider the joint motion to approve the settlement agreement was not an evidentiary proceeding and that no evidence would be taken, but thirty minutes for comments per side would be provided. The order also permitted the parties and Commission staff to submit up to 100 data requests each, with responses due within five days from the requests. Various data requests were propounded by the parties and Commission staff in advance of the hearing on the proposed settlement agreement.

On August 30, 2012, during the rate case hearing, the Commission announced on the record that the hearing would reconvene on September 27, 2012, to take up the proposed settlement agreement. Post-hearing briefs for the evidentiary hearing were filed on September 21, 2012. Upon reconvening the hearing, oral argument commenced and the Commission determined that the proposed settlement agreement raised five new disputed issues of material fact. Therefore, the Commission voted to take additional testimony limited to those

specific issues that were supplemental to the issues in the initial MFRs in an expedited manner that would comport with due process and all statutory requirements.

### 4. Evidentiary Hearing on Settlement Agreement

On October 3, 2012, the Chairman of the Commission issued a third order revising the order establishing procedure, continuing the hearing until November 19-21, 2012, to take evidence on the specific issues contained in the proposed settlement agreement that were supplemental to the issues of the rate case. Prior to the hearing, the parties filed the direct and rebuttal testimony of all witnesses on the settlement issues and the exhibits each witness would sponsor. The parties also engaged in discovery. The parties filed their prehearing statements, and a prehearing conference was held on November 15, 2012. The formal hearing reconvened on November 19, 2012, and concluded on November 20, 2012. Post-hearing briefs on the settlement issues were filed on November 30, 2012.

On December 13, 2012, pursuant to a notice issued on November 21, 2012, the Commission held a special agenda conference to rule upon the merits of the proposed settlement agreement. The Commission voiced public interest concerns about specific terms of the settlement agreement. The Commission then recessed to give all the parties an opportunity to engage in further settlement negotiations on areas of concern identified by the Commission. After some negotiation, the parties

presented the modified settlement to the Commission, which was ultimately approved.

### C. Application of Law to the Procedures Followed Below

### 1. Whether the Inclusion of the Riviera Beach and Port Everglades GBRA Provisions Should Have Resulted in the Filing of a New Application for a Change in Rates

Citizens argues that the GBRA provisions in the settlement agreement exceeded the scope of FPL's initial petition and affect rates, which should have required a new application for changes in rates under rules 25-6.140 and 25-6.043 of the Florida Administrative Code.

First, as emphasized above, these rules apply to petitions for changes in rates, not proposed settlement agreements; FPL complied with those rules with its initial filing petition. Although it may be the better practice to require a new application for changes in rates, there is no such requirement. Second, the GBRAs for the Riviera Beach and Port Everglades modernization projects will be tied to the 10.5% midpoint of FPL's authorized ROE and calculated using the capital structure reflected in the MFRs filed for the Cape Canaveral project; and the revenue requirements will be based on the "cumulative present value of revenue requirement reflected in the respective need determinations." And third, as discussed more fully below, the Commission provided ample opportunities for discovery and held hearings to consider the settlement agreement well after the

joint motion for approval of the settlement was filed by FPL and the intervenor signatories, and well after Citizens claimed it was prepared to argue the joint motion for approval of the settlement agreement. Citizens, however, correctly notes that the Commission has not been consistent with its treatment of GBRAs in the past.

In 2005, the Commission approved a settlement agreement that contained a provision allowing FPL to receive GBRAs for "any power plant that is approved pursuant to the Florida Power Plant Siting Act (PPSA) and achieves commercial operation within the term of this Stipulation and Settlement." In re Fla. Power & Light Co., Docket Nos. 050045-EI, 050188-EI, Order No. PSC-05-0902-S-EI, 2005 WL 2276715, *7 (F.P.S.C. Sep. 14, 2005). The term was for four years with rates going into effect until new rates became effective by order of the Commission. Id. at *1. Notably, FPL's application for a change in rates only included MFRs for a GBRA for Turkey Point Unit 5. Id.

In 2010, in the rate case immediately following the 2005 rate case, the Commission rejected a similar request from FPL to receive GBRAs for revenue requirements associated with new generating additions at the time they enter commercial service. In re: Petition for Increase in Rates by Fla. Power & Light Co., Docket Nos. 080677-EI, 090130-EI, Order No. PSC-10-0153-FOF-EI, 2010

WL 1005321, *10 (F.P.S.C. Mar. 17, 2010).  Instead, the Commission elected to

allow the previous GBRAs to expire.  The Commission specifically reasoned that:

> [t]he existing ratemaking procedure provided by Florida Statutes and
> our rules provides for a more rigorous and thorough review of the
> costs and earnings associated with new generating units.  Section
> 366.06(2), F.S., provides that when approved rates charged by a utility
> do not provide reasonable compensation for electrical service, the
> utility may request that we hold a public hearing and determine
> reasonable rates to be charged by the utility.  Section 366.071, F.S.,
> provides expedited approval of interim rates until issuance of a final
> order for a rate change.  Rule 25-0243, F.A.C., establishes the
> minimum filing requirements for utilities in a rate case.  These
> procedures have been sufficient in the past for FPL and other
> regulated utilities wishing to recover capital expenditures when a new
> generating facility begins commercial service.

Id.  Further, the Commission noted that "[i]t is not possible for us or interested

parties to examine projected costs at the same level of detail during a need

determination proceeding as we would be able to do in a traditional rate case

proceeding.  A need determination . . . does not allow for a review of the full scope

of costs and earnings, as a rate case does."  Id. at *12.  Thus, based on the 2010

case, it would appear that the Commission believes that GBRA requests should

entail the same requirements associated with an initial petition for a change in

rates.

The Commission, however, explained why the GBRAs sought in the 2010

case merited treatment distinct from the GBRAs in the 2005 case.  In a section

titled "Differences From the 2005 Stipulation," the Commission noted that FPL's

- 33 -

2010 request was to permanently establish GBRAs intended to cover the costs of all future power plants that receive need determination approval. Id. at *11. In the 2005 request, the GBRAs were also intended to cover the costs of all power plants, but the term of the agreement was for a minimum of four years and would remain in effect until new base rates and charges became effective by order of the Commission. Thus, the 2005 request was an interim measure and not a permanent measure. Further, acceptance of the 2005 GBRA provision of the settlement agreement was a result of the "give-and-take" in negotiating the agreement. Id. For instance, in the 2005 request, FPL's base rates could not change during the term of the settlement agreement whereas FPL's 2010 request to continue the GBRA specified no restriction on changes to base rates. The 2005 request also contained a revenue sharing plan between shareholders and customers whereas no such plan existed in the 2010 request. Id.

Here, the settlement contains terms that are similar or more proscriptive than the rate request of 2005. First, the GBRAs here are part of a settlement agreement with a fixed four-year term. In the 2005 rate case, the settlement had a term of a minimum of four years and the rates would remain in effect until the necessary steps were taken to adjust the established rates. Second, the disputed GBRAs in this case are intended to cover the costs of the Riviera Beach and Port Everglades projects, whereas the GBRA mechanism approved as part of the 2005 settlement

- 34 -

was intended to cover the costs of any and all power plants that received need determination approval during the settlement term. Third, both the 2005 agreement and the agreement approved here contained provisions prohibiting FPL from changing its base rates during the term of the settlement. And fourth, the 2005 request contained a revenue sharing plan between shareholders and customers; here, the settlement agreement contains an incentive mechanism where revenues are shared on an incremental basis. Thus, this current case is most similar to the 2005 case, in which the Commission found that the GBRA mechanism was appropriate and did not require the filing of MFRs and test year notifications for each plant approved pursuant to the PPSA.

Accordingly, despite the Commission's inconsistent approach and due to the deferential standard of review given to the Commission's decisions, we hold that FPL's request for GBRAs for the modernization projects did not necessitate the filing of a new petition.

2. Whether the Procedures Followed by the Commission in Consideration of the Proposed Settlement Violated Citizens' Due Process Rights

Based on the above, the Commission did not violate Citizens' due process rights. On March 26, 2012, the Commission provided notice of a hearing on August 20 that fully complied with section 120.569, which requires fourteen days' advance notice. On August 15, 2012, the Commission was presented with a joint motion to approve the settlement agreement. Although Florida Administrative

- 35 -

Code rule 28-106.204(1) provides that "[w]ritten motions will normally be disposed of after the [seven day] response period has expired,"—Citizens indicated this would be a sufficient amount of time to prepare a response and oral argument on the merits—the Commission issued a second order revising the order establishing procedure indicating that it would schedule a hearing at the conclusion of the evidentiary hearing to discuss the settlement agreement. On August 31, 2012, the Commission announced on the record that it would reconvene on September 27, 2012, to discuss the settlement issues. Notably, section 120.569(2)(b) does not require that notice be given in writing, although the rule dictates that notice be reasonable. Thus, the September 27, 2012, hearing was properly noticed and provided Citizens with more time than required pursuant to section 120.569(2)(b) and Florida Administrative Code rule 28-106.204(1). Then, on October 3, 2012, after the Commission determined there were supplemental issues of disputed fact and more than fourteen days before the next hearing, the Commission issued a written order providing notice and the procedures for the submission of evidence on November 19-21. Citizens and all other parties were able to request data and present evidence during these hearings. On November 21, 2012, more than fourteen days before the next conference, the Commission provided notice of an agenda conference on December 13, 2012, to reach a

decision on the settlement agreement. Thus, Citizens' due process rights were not violated because it received proper notice and was fully represented in all hearings.

Moreover, two cases from this Court are instructive on this issue. In Jaber, as noted earlier, this Court held that the Commission's decision to approve a non-unanimous negotiated settlement without an evidentiary hearing did not violate due process or the statutory rights of SFHHA in a rate review proceeding initiated by the Commission. Jaber, 887 So. 2d at 1212.

In Jaber, the settlement at issue on appeal resulted from a proceeding initiated by the Commission in August 2000 to consider the effect on FPL's retail rates of the formation of Florida's regional transmission organization and FPL's then-planned merger with Entergy Corporation. The Commission then expanded the scope of the proceeding to provide for a more thorough rate review, and ordered FPL to submit MFRs pursuant to rule 25-6.043. Id. at 1211. The parties participated in discovery and submitted witness testimony regarding the appropriateness of FPL's retail rates. Id. In October 2001, the Commission issued an order setting the matter for a hearing in April 2002. Id. In January 2002, the parties entered into settlement negotiations and a non-unanimous agreement was approved by each of the parties, excluding the SFHHA, in March 2002. Id. The Commission's staff reviewed the settlement and submitted it for approval at an agenda conference held on March 22, 2002. Id. at 1212. The Commission granted

each of the parties to the settlement five minutes to present their views in support of the agreement and provided SFHHA thirty minutes to respond in opposition. Id. Prior to holding an evidentiary hearing, the Commission issued the order approving the settlement agreement, which provided for a $250 million rate base reduction.

On appeal to this Court, SFHHA argued that the Commission's order approving the settlement in the absence of an evidentiary hearing violated its due process and statutory rights. Id. According to SFHHA, Florida law required the Commission to hold an evidentiary hearing because determining a reasonable level for FPL's rates involved numerous disputed issues of material fact. Id. SFHHA further asserted that the Commission erred in approving a non-unanimous settlement agreement absent a hearing. Id. This Court rejected those arguments.

This Court held in Jaber that the Commission's decision to expand the scope of its review did not require it to conduct an evidentiary hearing. The Court reasoned that the Commission properly initiated the proceeding, expressly recognized the possibility of a negotiated settlement, and acted in accordance with the authority granted under section 366.076(1) of the Florida Statutes in broadening its review. Further, the record showed that "[SFHHA] presented arguments in opposition to the settlement during the agenda conference held on May 22, 2002 . . . [and] [t]he assertions presented at that time tracked those

expounded by SFHHA throughout the course of the proceeding below."[10] Id. at 1213.

Here, there is no dispute that an evidentiary hearing was held more than fourteen days after notice was provided and after additional discovery was provided and sought. Further, like Jaber, Citizens presented arguments in opposition to the settlement and its assertions presented at the settlement agreement were similar to the assertions presented throughout the course of the proceedings below. Thus, although in a distinct procedural posture, this Court has found that there was no due process violation when the Commission approved a non-unanimous settlement agreement without conducting an evidentiary hearing.

In AmeriSteel Corp. v. Clark, this Court held that AmeriSteel's due process rights were not violated by the Commission's failure to require the Jacksonville Electric Authority (JEA) and FPL to provide public notice that its settlement discussions would encompass matters beyond the scope of JEA's initial complaint against FPL regarding a territorial dispute over service to certain customers. 691 So. 2d 473, 479 (Fla. 1997). Although AmeriSteel is distinct factually and

_____

10. The Court also noted in its reasoning that SFHHA did not contend that it was denied notice or was precluded from participating in the negotiation. Jaber, 887 So. 2d at 1213. Here, Citizens does not contend it was denied notice or was precluded from participating in the negotiation, but does assert that it was not invited to participate. Even if Citizens' assertion is true, the lack of an invitation does not dissuade this Court from applying the reasoning of Jaber to the instant case because of this Court's holding in AmeriSteel, which is discussed above.

procedurally, this Court's reasoning and analysis is instructive on the issue presented here. In AmeriSteel, the appellant was a customer of FPL, but the Commission did not allow it to intervene because it did not have requisite standing. However, AmeriSteel received notice of the Commission's proposed agency action order approving the territorial agreement and exercised its rights to file a protest in response.

In concluding that AmeriSteel's due process rights had not been violated, this Court noted that there "is no requirement in chapter 366, the Administrative Procedure Act, or Florida's Administrative Code that two negotiating utilities publish notice of the substance and scope of their ongoing negotiations and invite the participation of interested persons such as AmeriSteel." Id. This Court also reasoned "AmeriSteel was in no way precluded from exercising any of its procedural rights by the process followed by the Commission in approving the agreement." Id. Further, this Court stated, "If AmeriSteel had demonstrated standing, it would have been able to obtain a hearing, conduct discovery and present evidence challenging any aspect of the agreement pursuant to section 120.57." Id. Thus, this Court's holding and reasoning in AmeriSteel demonstrates that chapter 366, the APA, and the Florida Administrative Code provide due process requirements in a situation where settlement discussions encompass matters beyond the scope of the initial filing by a utility. Moreover, in the present

case, the process followed by the Commission did not preclude Citizens from exercising any of its procedural rights and Citizens participated in two different hearings spanning multiple days, conducted discovery, and presented evidence challenging FPL's initial petition and the terms of the settlement agreement.

## D. Conclusion

Accordingly, we affirm the Commission's final order because the Commission complied with all of the procedural requirements listed in chapter 366, the APA, and the Florida Administrative Code; and analogous cases support the conclusion that the process followed by the Commission in this case was sufficient. We now turn to Citizens' final argument on appeal.

## III. Whether the Elements of the Settlement Agreement are Supported by Competent, Substantial Evidence and Whether the Commission Exceeded the Limits of its Discretion in Approving the Settlement Agreement

As stated above, this Court will affirm the Commission's "findings and conclusions if they are based upon competent, substantial evidence and are not clearly erroneous." S. Alliance for Clean Energy, 113 So. 3d at 752. Further, this Court " 'will not overturn an order of the [Commission] because we would have arrived at a different result had we made the initial decision and we will not re-weigh the evidence.' " Id. at 753. For the following reasons, the Commission's findings and conclusions that the settlement agreement established rates that were

just, reasonable, and fair, and that the agreement is in the public interest are supported by competent, substantial evidence.

## A. Findings in Final Order

The Commission's final order contains an extensive procedural background of the case explaining how the settlement agreement was considered and ultimately approved. The order also describes the major elements of the proposed agreements and how those terms were modified in the settlement agreement that was incorporated into the final order. Further, the order describes the basis for each revenue increase and how the incentive mechanism is intended to function, including that the Commission can terminate the program after two years.

Regarding its findings, first, the Commission found that the GBRA is in the public interest because: "[I]t provides a benefit to both FPL's customers and FPL. We already approved the need for the Canaveral, Riviera, and Port Everglades Modernization Projects when we considered FPL's need determination petitions. The GBRA provides the mechanism for FPL to recover the costs to modernize these plants and bring them into commercial service." The Commission then found that the pilot incentive mechanism is in the public interest, stating, "The pilot incentive mechanism program is beneficial to both FPL's customers and FPL. We note that this is a four-year pilot program and we have the option to review it after two years. . . . If we determine the pilot program is otherwise unsatisfactory,

we may terminate the program."  The Commission then shifted its findings to the settlement, stating that "<u>as a whole</u> the settlement is in the public interest" because it "provides a reasonable resolution of all the issues in this proceeding regarding FPL's rates and charges."  Further, FPL's customers receive rates that are stable and predictable while FPL maintains the financial strength to make investments necessary to provide customers with safe and reliable power.  Finally, the Commission found that the settlement "establishes rates that are fair, just, and reasonable in the public interest."[11]  Accordingly, this Court must determine whether these findings and conclusions are supported by competent, substantial evidence.  We now turn to each of Citizens' arguments sequentially.  As noted below, we affirm the Commission's final order because its findings are supported by competent, substantial evidence.

---

11. When a settlement addresses rate levels and structures, section 366.041, Florida Statutes (2012), provides that the Commission may "give consideration, among other things, to the efficiency, sufficiency, and adequacy of the facilities provided and the services rendered; the cost of providing such service and the value of such service to the public; the ability of the utility to improve such service and facilities; and energy conservation and the efficient use of alternative energy resources; provided that no public utility shall be denied a reasonable rate of return upon its rate base in any order entered pursuant to such proceedings."

B. The Settlement Agreement Benefits Only Narrow Customer Interests[12]

Citizens argues that the settlement only benefits narrow interests and that its "opposition to the proposed disposition disprove[s] the conclusion at page [seven] of the Final Order that the settlement reasonably resolves all issues." This argument appears to invite the Court to reweigh competing evidence considered by the Commission, which, as stated above, is not this Court's function on review. Even if this argument is not an invitation to reweigh the evidence, Citizens fails to demonstrate that the Commission's conclusion that the settlement agreement benefits "FPL's customers" is not supported by competent, substantial evidence.

Witnesses Renae Deaton and Moray Dewhurst testified that FPL's residential customer bills will remain the lowest in Florida, bills for commercial and industrial customers will be more competitive with other, similar utilities in the region, and small business customers will not receive an increase. Specifically, witness Deaton testified that the revenue requirements of $378 million under the proposed agreement, which later became $350 million with $18 million of the reductions going specifically to the residential customer class under the modified agreement, would impact a June 2013 residential bill by increasing rates by $1.54 a

_____

12. Although Citizens repeatedly asserted that residential customers represent 99% of FPL's customer base, 48% of FPL's sales of electricity are provided to customers who are served under the same rate schedules as the signatories to the agreement.

month or five cents per day, which represents less than a 2% increase from current rates. Deaton also testified that parity—the extent to which the revenues of a rate class cover the cost of service to that rate class—is improved under the proposed settlement agreement, with all rate classes being either within the range of 90% to 110% of parity, or being moved toward that objective. The rates for residential customers would remain very close to the ideal of 100% under the proposed settlement agreement. Florida Industrial Power Users Group (FIPUG) witness Pollock then testified that the settlement agreement significantly reduces the base rate revenues for the vast majority of rate classes relative to the company's proposal without shifting costs.

Witness Dewhurst also testified that customers would continue to enjoy good reliability and excellent customer service over a four-year period. Dewhurst further testified that "[t]he proposed settlement agreement provides for a roughly 25% reduction in FPL's January 2013 base rate increase request, from $517 million to $378 million." The final approved revenue increase was reduced further to $350 million.

Witness Terry Deason, a former commissioner of the Commission, testified regarding the benefits of the settlement and how they served the public interest. He testified that FPL "significantly reduc[ed] the amount of their request"; the agreement is for a four-year term, which provides a great deal of certainty and

predictability; and the settlement "reduces uncertainty in the process," which positions FPL to "continue to have the financial integrity to go forward with their construction program, which benefits customers, and to be able to maintain a high degree of service." Further, the four-year term eliminates the unnecessary expenditure of taxpayer funds to consider FPL's rates in another proceeding. Accordingly, Citizens cannot demonstrate that the Commission's conclusion that the settlement agreement benefits "FPL's customers" is not supported by competent, substantial evidence.

C. The Commission's Conclusion That the Settlement is a Fair and Reasonable Resolution is not Supported by Competent, Substantial Evidence

Citizens argues that the settlement consists of concessions to FPL for which non-signatories of the settlement agreement receive no concomitant benefits in return. Thus, Citizens argues that the Commission's conclusion that the settlement is a reasonable disposition of all issues is not supported by competent, substantial evidence, and is clearly erroneous. According to Citizens, the following six provisions of the settlement agreement are evidence that the settlement was not a reasonable compromise.

1. The 10.5% ROE Results in Unfair and Unreasonable Rates

Citizens argues that FPL's original request for a ROE midpoint of 11.25%, and a performance adder of .25%, was not supported by competent, substantial evidence. Citizens recognizes that many FPL witnesses and other signatory

witnesses testified that the ROE was warranted or that a 10.5% ROE was reasonable given the other elements of the settlement agreement, but Citizens nevertheless argues that its experts' testimony demonstrated that the ROE was too high. In United Telephone Co. v. Mayo, this Court recognized that the Commission had the difficult task of determining a reasonable rate of return for a utility, but that it was the Commission's "prerogative to evaluate the testimony of competing experts and accord whatever weight to the conflicting opinions it deems appropriate." 345 So. 2d 648, 654 (Fla. 1977). Thus, as discussed below, although there was competing expert testimony offered by Citizens, competent, substantial evidence supports the Commission's conclusion.

Citizens argues that FPL's ROE should have been reduced, not increased, from the 10% approved in 2010 primarily because interest rates are low and cost of capital has declined. FPL's witnesses and other witnesses, however, supported the increase in ROE. Witness William Avera, a principal of Financial Concepts and Applications, Inc.,[13] testified that there is significant financial literature stating that an inverse relationship between equity risk premiums and interest rates exists. Thus, when interest rates are low, equity risk premiums are higher. Further, FPL President Eric Silagy testified that the previous ROE of 10% was the "lowest of all Florida investor-owned utilities ('IOUs') and among the lowest nationally, based

13. A firm engaged in financial, economic, and policy consulting to businesses and government.

- 47 -

on decisions rendered since our last base rate proceeding." Witness Dewhurst testified that the intervenors' recommendations would weaken FPL's financial strength, resulting in further degradation of credit and downgrades to ratings, and would revive investor perceptions of regulatory risk, which would increase the cost of capital and decrease the availability of such capital.

Citizens argues that witness Jeffry Pollock's testimony regarding the ROE ignored the impact of FPL's extremely high 59.62% equity ratio. Witness Avera, however, testified that the ROE is not a function of a single financial statistic because it does not account for other factors considered by investors, "including the impact of purchased power commitments and the other exposures unique to FPL." Further, he testified that the ROE requested was reasonable because "the availability of capital is particularly important to FPL's customers because of the need for financial strength inherent in FPL's location and characteristics." Also notable is that FPL requested a midpoint ROE of 11.25%, negotiated a 10.7% midpoint, and ultimately agreed to a 10.5% midpoint ROE, which was only slightly higher than the minimum range of ROE requested. Finally, witness Pollock testified that the 10.7% ROE provided a competitive ROE that was above average relative to returns authorized by other commissions for investor-owned electric utilities, but stated that it would enable FPL to maintain an A credit rating and that it was not a sufficient ground to reject the settlement. Pollock also

observed that other utilities in this comparison (southeastern utilities) currently had authorized ROEs higher than 10.7%, including a Florida investor-owned utility earning a ROE of 11.25%. All of the testimony referenced above supports a ROE figure higher than the 10.5% sum contained within the settlement agreement. Accordingly, the Commission's conclusion that a 10.5% ROE as part of a settlement agreement is a reasonable resolution of the issue is supported by competent, substantial evidence.

2. The $350 Million Rate Base Increase Results in Unfair and Unreasonable Rates

Citizens argues that its litigation position was that FPL's $516.5 million request was $140 million above what it should have been. Thus, according to Citizens, any effort to characterize this reduction from $516.5 million to $350 million as a "compromise" is untenable and "[n]o reasonable mind would regard a term that reflects the surrendering of practically all litigated rate base adjustments as offsetting an unduly high ROE, or otherwise providing substantial evidence reasonably tending to support the conclusion that the final order approves a fair and reasonable compromise settlement." In short, Citizens argues that FPL did not compromise at all on this position because it lowered its requested revenue requirements. However, competent, substantial evidence supports the Commission's conclusion.

The rate base filing, which requested $516.5 million, is supported by many witnesses. Marlene Santos, Vice President of Customer Service at FPL, testified regarding customer-service related costs. She noted that process management and leveraging of technology resulted in a cost per customer of $7.58; FPL's cost per customer for billing expenses is $4.84; and FPL's cost per customer for payment service expenses is $0.61. Manuel Miranda, Vice President of the Transmission and Substation Business Unit, testified regarding transmission costs. He testified that compliance with federal regulations increases operations and management expenditures, and that the Transmission and Substation Business Unit's capital expenditures were projected to be $183 million.[14] George K. Hardy, Vice President of Distribution at FPL, testified regarding distribution costs. He stated that capital expenditures were projected to be $430 million for the test year.[15]

14. According to Miranda, the expenditures were as follows: (1) $53 million for replacement, refurbishment, and reliability of infrastructure; (2) $35 million for projects to meet transmission system requirements; (3) $31 million for Commission-mandated programs; (4) $23 million for projects to meet distribution system requirements; (5) $19 million for projects resulting from revision to federal regulations; (6) $8 million for technology upgrades; (7) $8 million for the Transmission 500kV System Program; and (8) $6 million for non-reimbursable relocations.

15. He attributed the expenditures to: (1) $112 million for customer and system growth; (2) $106 million for hardening/strengthening activities such as the pole inspection program; (3) $92 million for restoration such as repairing and restoring facilities that have failed; (4) $58 million for reliability such as underground feeder and lateral cable rehabilitation; and (5) $62 million for customer response and field support such as non-reimbursable facility relocation

Kim Ousdahl, Vice President, Controller, and Chief Accounting Officer of FPL, also testified. Her testimony was in reference to methodologies employed to account for FPL's costs. She testified that FPL's adjusted ROE was estimated to be 8.2% absent rate relief. Roxane Kennedy, Vice President of Power Generation Operations at FPL, testified regarding costs related to FPL's fossil plant fleet. She testified that FPL's annual fossil base capital expenditures were projected to increase $164.8 million from $206.6 million in 2010 to $371.4 million in 2013. Further, she testified that the primary drivers of the increase are investments in combustion turbine (CT) hot end component upgrades ($95.6 million), CT planned maintenance overhauls ($41.1 million), work being done on Martin Unit 1 ($12.7 million) while the Electrostatic Precipitator outage is performed, and maintenance work at West County 3 ($11.3 million) and Canaveral Modernization Project ($2.7 million), units which were not in operation in 2010. Kathleen Slattery, Senior Director of Executive Services and Compensation at FPL, testified regarding costs related to human resources. She testified that FPL's gross total compensation and benefits cost was projected to be $1.261 billion for 2013, and FPL's gross total compensation and benefits cost was projected to be $1.049 billion for 2013.[16]

costs resulting from road construction projects, and the purchase of vehicles and equipment to support construction activities.

16. She also noted that FPL excluded from its expense request the portions of executive and non-executive incentive compensation that were excluded from

Finally, Robert Barrett, Jr., Vice President of Finance at FPL, testified regarding the necessity of a base rate increase.

Barrett testified that the rate base increase was determined as the difference between FPL's projected net operating income of $1.156 billion and FPL's required net operating income of $1.473 billion multiplied by the revenue expansion factor of 1.63188. He further testified that: (1) FPL was able to earn 11.0% ROE in 2010 and 2011 largely because of extreme weather that resulted in exceptionally high sales and revenues; (2) FPL projected it would be able to offset the increased revenue requirements in 2012 only by amortizing $526 million of depreciation surplus; (3) there is projected to be only $191 million of depreciation surplus left to amortize in 2013; (4) the difference between what was needed in 2012 and what is left for 2013, together with the impact of the increase to rate base resulting from the amortization, creates a need for $367 million in additional revenues; (5) revenue requirements associated with allowing FPL an opportunity to earn a ROE of 11.5% is $80 million; and (6) other net revenue requirements are expected to grow about $70 million from 2012 to 2013. He also testified the primary drivers of the change in revenue requirements were: (1) $162 million due to inflation; (2) $122 million due to a difference in the weighted cost of capital due

the 2010 rate order, and that for the period from 2009 to 2013, FPL's total compensation or gross payroll expense was forecasted to increase from about $973 million to about $1.049 billion.

to the necessary increase in the authorized ROE partially offset by other decreases in other elements; (3) $116 million due to investments in infrastructure that provide long-term economic and/or reliability benefits to customers; (4) $104 million due to the cumulative impact of the accelerated depreciation surplus amortization required by a 2010 Rate Order and effected through a 2010 Rate Settlement; (5) $65 million due to system growth; (6) $56 million due to increased expenditures required for regulatory compliance; (7) ($76 million) due to productivity gains that have mitigated some of these increases; and (8) ($32 million) due to revenue growth that partially offsets the growth in revenue requirements.

Moreover, pursuant to the agreement, FPL foregoes its right to seek rate increases over the four-year term, regardless of FPL's increased expenses, lost revenues, or new non-generation capital projects during that period.[17] Accordingly, the Commission's conclusion that a $350 million rate base increase would result in reasonable and fair rates is supported by competent, substantial evidence.

3. <u>Competent, Substantial Evidence Does Not Support the Commission's Conclusion That the GBRAs for Riviera Beach and Port Everglades are Part of a Reasonable Compromise</u>

Citizens argues that the GBRAs for the Riviera Beach and Port Everglades modernization projects would ensure that FPL receives more revenues under the

---

17. FPL's last rate case was in 2010.

compromise than it would have earned under the original petition, even if the 11.5% ROE had been authorized. Further, Citizens argues that in the past FPL has absorbed several power plants without the necessity of any increases and that the GBRAs agreed to here would relieve FPL from the burden of demonstrating that it requires an increase in base rates given the totality of its operations. As shown below, however, the Commission's conclusion that the GBRAs are part of a reasonable compromise and in the public interest is supported by competent, substantial evidence.

Witness Barrett testified that additional base rate increases would be necessary during the four-year term of the settlement to provide FPL an opportunity to recover the revenue requirements for these projects. He also testified that there were several reasons why it was unlikely to avoid rate base increases for these modernization projects: (1) absent rate adjustments, FPL will experience declines in earned ROE of 148 and 136 basis points when the projects go into service; (2) due to modest customer growth, increase in revenues from growth will not offset the cost of these modernizations; (3) it is highly unlikely that FPL can produce gains in productivity to offset the need for a rate base increase; and (4) FPL is investing in substantial infrastructure and the settlement does not have provisions to allow recovery of those investments.

Further, the GBRA mechanism is reasonable and inures to everyone's benefit. The GBRA mechanism safeguards customers—absent special circumstances, the costs recovered through the GBRA cannot exceed the estimated construction costs approved in the need determination proceedings, which the Commission has already determined is the most cost-effective alternative. Further, witness Barrett testified that if actual costs upon completion are lower than projected, customer rates are automatically lowered. Customers also experience an additional reduction in fuel charges at the time the plants come into service.

Regarding Citizens' argument that FPL did not demonstrate a need for the rate base adjustments, the costs associated with these units were thoroughly reviewed and approved by the Commission in prior need determination proceedings. Witness Deason testified that "the rigors of cost review and operational scrutiny was as great or greater in the need determinations as the level of review and scrutiny when those plants were placed in rate base in a rate case." Need determination proceedings involve an extensive analysis of the costs of generation projects, and FPL effectively proved that the projects would improve customer bill affordability. Finally, when implemented, the GBRAs will not increase FPL's ROE above 10.5%. Accordingly, competent, substantial evidence supports the Commission's conclusion that the GBRAs are in the public interest and are part of a reasonable compromise of all the issues.

4. Amortization of Dismantlement Reserves Results in Unfair Rates

Citizens also argues that the proper purpose of amortization of a reserve is to eliminate intergenerational inequity, not enhance earnings as done here. Thus, Citizens argues that this provision is not a reasonable resolution of the disputed issues and results in unfair rates. As demonstrated below, there is competent, substantial evidence supporting the reasonableness of the amortization of the dismantlement reserve.

Witness Dewhurst testified that the "ability to flexibly amortize certain non-cash expense credits or debits over the period of an agreement has been used on multiple occasions," and that "this flexibility is motivated in part by the economic life extension of the three major generation sites that FPL is currently modernizing, effectively deferring much further into the future the need to utilize a portion of the dismantlement reserve." Witness Barrett testified:

> FPL's dismantlement reserve for the Modernization Project sites contains amounts collected for dismantlement costs that have now been deferred substantially beyond the timeframe assumed in the currently authorized accruals. Thus, it does not violate the matching principle to provide an accelerated return of a portion of the dismantlement reserve to the customers who have been funding it. That is, in fact, precisely the effect of the dismantlement reserve amortization in the Proposed Settlement Agreement.

He also noted that the use of an accelerated amortization coupled with a reserve surplus position was advocated by Citizens in FPL's last rate case proceeding. It was also advocated by Citizens in FPL's 2002 proceeding. Further, he stated that

the dismantlement amortization cannot realistically be characterized as leading to significant intergenerational differences. Barrett also stated that the dismantlement amortization provision is needed to keep the size of the rate increase modest and to keep a four-year term. Otherwise, rates could be higher and the term could be shorter. Thus, according to Barrett, this benefits customers.

Witness Kollen also testified regarding this provision. Kollen testified that the provision was in the public interest because: (1) the settlement avoids future rate base increases over the next four years by allowing FPL to amortize the remainder of the depreciation surplus and a portion of the dismantlement reserve previously recovered from customers to maintain its ROE within the range established in these proceedings subject to an amortization limit of $400 million; (2) it ensures that customers retain the full amount of the excess depreciation reserve that actually existed on December 31, 2012, if it is greater than the amount projected by FPL and, if the actual amount is less than FPL projected, FPL bears the risk; and (3) continued amortization of the excess depreciation reserve returns the excess amounts collected in prior years to customers over a shorter period of time than if the excess depreciation reserve were returned to customers over the remaining lives of the underlying assets as reflected in FPL's approved depreciation rates. Accordingly, there is competent, substantial evidence supporting the reasonableness of the amortization of the dismantlement reserve.

### 5. Postponement of Depreciation and Fossil Dismantlement Studies is not Part of a Reasonable Compromise and Results in Unfair Rates

Although fossil dismantlement studies were not a major component of the settlement agreement noted in the final order, there is competent, substantial evidence supporting the conclusion that this provision contributes to a reasonable resolution of all the issues, is in the public interest, and does not result in unfair rates.

Witness Barrett testified that this provision was in the public interest because rate stability and predictability were important in this settlement and FPL has agreed to manage currently unknown and unanticipated cost and revenue changes during the next four years without the ability to file an application for a change in rates. Thus, according to Barrett, FPL could not commit to a settlement with fixed base rates, while assuming the risk of depreciation or dismantlement accrual increases during the settlement term. Barrett also explained that it would be unreasonable to expect customers to have fixed base rates if FPL's depreciation accruals were reduced.

Witness Kollen also testified that this provision was in the public interest because "it is essential to ensure that [FPL] and its customers both obtain the benefit of the settlement bargain and the relationship between base revenues and the expenses used to support the base revenue requirement. . . ." Further, Kollen testified that "[because the settlement precludes a change in base rates to reflect

changes in depreciation expense] there should be no change in depreciation rates during the next four years. . . ."  Kollen also reiterated Barrett's testimony that it would be unfair for either customers or FPL to commit to fixed rates and then have dismantlement accrual increases or decreases that normally would be accompanied with a change in rates.  Accordingly, competent, substantial evidence supports the Commission's conclusion that this provision is part of a reasonable resolution of all the issues resulting in fair, just, and reasonable rates that are in the public interest.

### 6.  The Asset Optimization and Gains Sharing Provision is not Part of a Reasonable Resolution of All the Issues

Citizens argues that this provision authorizes FPL to exact "bonuses" from customers for fundamental service activities that FPL already provides.  Further, Citizens argues that FPL's customers would have paid FPL $47 million for economy power purchases between 2001 and the present if FPL's proposal had been in place during those years.  Thus, according to Citizens, no reasonable mind would regard this provision as competent, substantial evidence supporting the conclusion that the settlement is a reasonable compromise of counterbalancing provisions.  As demonstrated below, competent, substantial evidence demonstrates that this provision is part of a reasonable resolution of all the issues, is in the public interest, and does not result in unfair rates.

Witness Sam Forrest, Vice President of Energy Marketing and Trading at FPL, testified that the asset optimization provision in the settlement agreement overhauls an incentive program that was created in 2000. He also testified that from 2001 to 2011, FPL delivered approximately $158 million in benefits to customers while sharing in just under $2 million, but has not shared any benefits since 2006. He testified that the mechanism seeks to enhance the existing one by expanding the focus of the incentives to encourage FPL to pursue a wider range of gains for the benefit of customers. Further, it would update the sharing threshold to provide a more meaningful opportunity for FPL to share in the benefits that it delivers to customers, but only if FPL is successful in delivering additional value to customers.

Specifically, under the terms of the agreement, customers will receive 100% of the gain on wholesale power purchases and sales up to $46 million annually, and gains above the $46 million will be shared between FPL and customers. Witness Dewhurst testified that "this term will encourage FPL to seek greater value for customers." Witness Forrest also testified that the five years chosen by Citizens' witness at the hearing show that FPL only received 0.38% of the total benefits in incentives under the current mechanism, which was insufficient to provide incentives to FPL. Under the new agreement during those same five years, customers would have received approximately 84% of the total benefits. Further,

over the full eleven years in which the current incentive mechanism has been in place, FPL customers would have received more than 90% of the total benefits. Thus, according to witness Forrest, this proposed incentive mechanism does not unreasonably favor FPL.

Customers stand to make almost $11 million more in optimization benefits than they would otherwise receive without the new incentive mechanism. Additionally, witness Kollen testified that the provision is in the public interest because as the three modernization projects are completed, FPL should be able to reduce wholesale power purchases and increase sales. Thus, these gains will partially offset the GBRAs. Moreover, this is a four-year pilot program, which the Commission has the option to review after two years. If the Commission determines at that time that the program is unsatisfactory, it may terminate the program. Accordingly, the Commission's conclusion that the asset optimization incentive program is in the public interest and part of a reasonable resolution of disputed issues is supported by competent, substantial evidence.

D. Unfair and Unreasonable Rates are not in the Public Interest and the Commission's Approval of Them Exceeded the Limits of its Discretion

The determination of what is in the public interest rests exclusively with the Commission. See § 366.01, Fla. Stat. (2012) (declaring the regulation of public utilities to be in the public interest, and deeming Chapter 366 "to be an exercise of the police power of the state for the protection of the public welfare and all the

provisions [thereof] shall be liberally construed for the accomplishment of that purpose"). Thus, having concluded above that the Commission's conclusions and findings on each provision of the settlement agreement are supported by competent, substantial evidence, the Commission's determination that the settlement as a whole is in the public interest and that it results in rates that are just, fair, and reasonable is supported by competent, substantial evidence.

## CONCLUSION

Based on the foregoing, Citizens has not demonstrated that the Commission violated the essential requirements of the law or committed a material error in procedure by approving the negotiated settlement agreement over Citizens' active objection, Citizens' due process rights were not violated, and the Commission's findings and conclusions are supported by competent, substantial evidence and are not clearly erroneous. For these reasons, we affirm the Commission's final order approving the settlement agreement authorizing FPL to adjust its rates.

It is so ordered.

PARIENTE, LEWIS, CANADY, POLSTON, and PERRY, JJ., concur.
QUINCE, J., concurs in result only.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION, AND IF FILED, DETERMINED.

An Appeal from the Florida Public Service Commission

James Ray Kelly, Public Counsel, Joseph Allan McGlothlin, Associate Public Counsel, Charles John Rehwinkel, Deputy Public Counsel, and Patricia Ann

Christensen, Associate Public Counsel, Office of Public Counsel, Tallahassee, Florida,

for Appellant

S. Curtis Kiser, General Counsel, Samantha M. Cibula, Attorney Supervisor, and Rosanne Gervasi, Senior Attorney, Tallahassee, Florida,

for Appellee Florida Public Service Commission

Jon Cameron Moyle, Jr., Moyle Law Firm, Tallahassee, Florida, and Kenneth L. Wiseman and Mark F. Sundback, Andrews Kurth, L.L.P., Washington, District of Columbia,

for Appellee Florida Industrial Power Users Group and South Florida Hospital and Health Care Association

John T. Butler, Assistant General Counsel-Regulatory and María Jose Moncada, Principal Attorney, Florida Power and Light Company, Juno Beach, Florida, and Alvin Bruce Davis and Raúl B. Mañón, Squire Sanders (US) LLP, Miami, Florida,

for Appellee Florida Power and Light Company

Julie Nepveu, AARP Foundation Litigation, Washington, District of Columbia, and Jack L. McRay, AARP Florida, Tallahassee, Florida,

for Amicus Curiae AARP