# Supreme Court of Florida

_____

No. SC2021-1761

_____

**FLORIDIANS AGAINST INCREASED RATES, INC.,**
Appellant,

vs.

**GARY F. CLARK, etc., et al.,**
Appellees.

_____

No. SC2022-0012

_____

**FLORIDA RISING, INC., et al.,**
Appellants,

vs.

**GARY F. CLARK, etc., et al.,**
Appellees.

September 28, 2023

COURIEL, J.

We have for review a decision of the Public Service

Commission relating to rates charged by Florida Power & Light

Company (FPL) for the provision of electric service.[1] We find that the Commission has not supplied a basis for meaningful judicial review of its conclusion that the settlement agreement at issue "provides a reasonable resolution of all issues raised, establishes rates that are fair, just, and reasonable, and is in the public interest." So we remand this case to the Commission for an explanation of its decision consistent with the governing law as set forth in our case law and reiterated here.[2]

---

1. We have jurisdiction. *See* art. V, § 3(b)(2), Fla. Const.; *see also* § 366.10, Fla. Stat. (2023).

2. Appellants raise other arguments in opposition to the Commission's approval of the settlement agreement. These arguments include challenges to the Commission's statutory authority to approve various pieces of the settlement agreement: the Storm Cost Recovery Mechanism; the Reserve Surplus Amortization Mechanism; the Asset Optimization Incentive, which includes the monetization of renewable energy credits; a corporate tax adjustment; the Solar Base Rate Adjustment mechanism (SoBRA); a construction incentive for solar generation sites constructed pursuant to SoBRA; and cost recovery related to the Green Hydrogen Pilot Program and a consummation payment FPL made to Jacksonville Electric Authority concerning the retirement of a coal-fired power generation unit. To the extent any of these challenges to the Commission's statutory authority is preserved, none gives us a reason to set aside the order under review.

- 2 -

The Commission approved a settlement agreement among FPL and seven parties that intervened in this matter. The settlement agreement, which took effect in January 2022, permits FPL to increase rates annually for (at least) four years and offer the same rate schedules throughout its service area.[3] It allows FPL to increase its base rates and service charges such that FPL could generate an additional $692 million in revenue in 2022 and an additional $560 million in revenue in 2023. It also allows for incremental increases in rates related to the construction of certain solar projects; rates are estimated to increase by $140 million in both 2024 and 2025.[4] The settlement agreement authorizes an

---

3. Gulf Power Company was merged into FPL in January 2021. The settlement agreement allows FPL to offer the same rate schedules to all post-merger customers. But because it will at first be more expensive for FPL to service customers residing in pre-merger Gulf Power service areas, the settlement agreement allows FPL, for five years, to apply transition riders to the bills of those customers and a corresponding transition credit to the bills of customers in pre-merger FPL service areas.

4. When this case was before the Commission in August 2021, a witness predicted that, as a result of all the rate increases authorized in the settlement agreement, a typical 1,000-kWh residential bill for customers serviced by FPL before the merger with

equity-to-debt ratio of 59.6%,[5] and a return on equity (ROE)[6]

between 9.7% to 11.7%, with a midpoint of 10.6%.[7]  It further

Gulf Power would rise from $101.70 in January 2021 to $107.78 in January 2022 and would be $115.34 by January 2025.

5.  A utility company finances its operations with both shareholder investment (equity) and debt.  The equity-to-debt ratio describes a company's capital structure by explaining how much of its financing comes from shareholder investment and how much comes from borrowing.  *See Sierra Club v. Fed. Energy Regul. Comm'n*, 867 F.3d 1357, 1376 (D.C. Cir. 2017).  Typically, the more an electric utility company's financing comes from equity, the higher its rates will be, as equity investors often require a higher rate of return than creditors, or debt investors, do.  *Id.* at 1376-77.  In this case, the requested ratio provides that 59.6% of FPL's financing will come from equity, and 40.4% will come from debt.

6.  Return on equity is the rate of return that a shareholder receives on an investment in the company.  *See Sierra Club v. Fed. Energy Regul. Comm'n*, 38 F.4th 220, 229 (D.C. Cir. 2022).  Courts have said that companies in this regulated industry can expect a rate of return to shareholders comparable to the rates offered by similar companies in the industry, and that the authorized rate of return should be high enough to allow the company to maintain its financial health and attract additional capital investment.  *See Fed. Power Comm'n v. Hope Nat. Gas Co.*, 320 U.S. 591, 603 (1944).  By establishing both a midpoint and range, "the commission is acknowledging the economic reality that a company's rate of return [on equity] will fluctuate in the course of a normal business cycle."  *United Tel. Co. of Fla. v. Mann*, 403 So. 2d 962, 967-68 (Fla. 1981).

7.  If the average 30-year U.S. Treasury Bond yield rate is at least 50 basis points greater than the yield rate on August 10, 2021, the date the settlement agreement was filed with the Commission, for any period of six straight months, then FPL is authorized under the settlement agreement to increase its ROE range to 9.8% to 11.8%, with a mid-point of 10.8%.  An increase in

provides that FPL can charge a minimum base bill of $25.00 to residential customers and certain business customers with low energy usage.

The settlement agreement authorizes increased investment in FPL's power generation facilities, transmission and distribution systems, and several pilot programs for electric vehicles (EV) and renewable energy. It includes the expansion of SolarTogether, an additional solar program to the one mentioned above, which allocates newly built solar capacity to different customer classes and allows customers to subscribe to a portion of this capacity in exchange for a credit funded by the general body of ratepayers. It permits FPL to adopt new depreciation timelines and continue using the Reserve Surplus Amortization Mechanism (RSAM).[8]

the ROE range and midpoint resulting from the implementation of this provision would not, under the terms of the settlement agreement, result in a corresponding increase in base rates.

8. A depreciation reserve surplus occurs when a company collects a higher amount than needed to cover depreciation expenses given new information revealing that an asset, like a plant, has a longer-than-expected service life. According to one witness, with the RSAM, FPL can use its depreciation reserve surplus to "absorb changes primarily in cash revenues and

Additionally, FPL can adjust rates incrementally if costs change because of a named tropical system or its successor, like a hurricane, or a permanent change in federal or state corporate tax rates. And FPL is allowed to share in the savings that result from an expanded version of its asset optimization program. The settlement agreement also extends, from ten years to twenty, the time over which FPL can recover the cost of certain retired assets.

The Commission heard arguments in favor of and against the settlement agreement. Appellants, who did not sign the settlement agreement, argued that it was not in the public interest and would result in unreasonably high rates. They questioned the need for the rate increases in the settlement agreement, contended that both the ROE range and the amount of equity in the equity-to-debt ratio were excessive, and asserted that the RSAM unfairly deprives customers of a surplus created by funds they supplied. Appellants also argued that FPL's projected rate base investments and pilot programs were unreasonable, and that the settlement agreement—

expenses while maintaining a pre-established ROE within its authorized range without an increase in customer rates."

including the expanded SolarTogether program and the minimum bill—favored commercial and industrial customers at the expense of residential and small business customers. As for the minimum bill specifically, Appellants stated that it requires some customers to pay for more electricity than they use. Appellants also challenged the settlement agreement's extension of time for FPL's recovery of retirement costs of certain assets; the extension, they contended, would lead to increased costs and force ratepayers to pay for obsolete assets.

In response, FPL and other signatories to the settlement agreement contended that it would provide customers with stable, predictable, and reasonable rates. FPL settled for a smaller rate increase than it first sought, including for residential customers in 2022 and 2023. Signatories defended the reasonableness of the ROE range and equity-to-debt ratio. They argued that the RSAM allows FPL to handle changes in revenue and expenses during the settlement agreement's term without having to seek more rate increases, benefitting both FPL and customers. Signatories maintained that the increased investment in both cost-effective clean energy programs and improvements to the rate base, such as

- 7 -

installing new power generation facilities and expanding transmission and distribution systems, was reasonable. They asserted that the settlement agreement as a whole, including the expanded SolarTogether program, did not result in unfair and discriminatory rates for any customer classes. Signatories pointed out that the settlement agreement complies with the Commission's gradualism principle,[9] and claimed that it moved all major rate classes closer to parity. They also argued that the expanded SolarTogether program was in the interest of all ratepayers: only participants are projected to pay for the expanded program as a whole, yet the general body of ratepayers is projected to receive 45% of the benefits.

As to the minimum bill, signatories said it ensures that all customers, including those that use only a small amount of electricity, contribute toward their fair share of fixed system costs necessary to connect and service customers. Regarding the

---

9. As one witness described it, the Commission's gradualism principle limits the increase in the amount of revenue allocated to "each rate class to 1.5 times the system average increase in revenue," and does not "allow[] any class to receive a decrease" in the amount of revenue for which it is responsible.

extended cost recovery period for certain retired assets, signatories argued that it would reduce current revenue requirements without resulting in a significant difference in costs for ratepayers over the twenty-year term of the extended period. Signatories also argued that it was fair to ask future ratepayers to bear some of the retirement costs, as they will still benefit from the retirement of the included assets.

Having heard all this, the Commission concluded that the settlement agreement "provides a reasonable resolution of all issues raised, establishes rates that are fair, just, and reasonable, and is in the public interest." In support of this conclusion, the Commission cited FPL's quality of service, reliability, and performance; the benefits to customers of the consolidation of FPL's and Gulf Energy's systems; the $428 million reduction in requested base rate increase in the settlement agreement when compared to FPL's as-filed case; FPL's typical 1,000-kWh residential bill, which is projected to remain 21% below the current national average; the various mechanisms in the settlement agreement that allow for a four-year rate plan, providing stability for customers and financial security for FPL; the increased investment in both solar and EV

programs; and the fact that the Office of Public Counsel[10] and other signatories representing a broad section of FPL's customer classes supported the settlement agreement.

The Commission's reasoning about whether all this is in the public interest covers less than two pages of the over 70,000 in the record we have for review.

**II**

**A**

The Public Service Commission has the power to "determine and fix fair, just, and reasonable rates that may be requested, demanded, charged, or collected by any public utility for its service." § 366.06(1), Fla. Stat. (2021); *see also* § 366.05(1)(a), Fla. Stat. (2021) ("[T]he commission shall have power to prescribe fair and reasonable rates and charges . . . ."). In doing so, the Commission must act in the "public interest," section 366.01, Florida Statutes (2021), and ensure that no public utility gives "any

---

10. The Office of Public Counsel is the "statutorily created representative of all FPL ratepayers" in proceedings before the Commission. *Sierra Club v. Brown,* 243 So. 3d 903, 915 (Fla. 2018); *see* §§ 350.061, 350.0611, Fla. Stat. (2021).

undue or unreasonable preference or advantage" to any customer, section 366.03, Florida Statutes (2021).

We have repeatedly recognized the "broad legislative grant of authority" afforded to the Commission and the "considerable license" it enjoys in fixing fair, just, and reasonable rates. *Citizens of State v. Pub. Serv. Comm'n*, 425 So. 2d 534, 540 (Fla. 1982).[11] In exercising this authority, when it reviews a settlement agreement, the Commission does two things. First, it makes factual findings

---

11. Our dissenting colleagues are correct that the Commission is an "arm of the legislative branch of government," section 350.001, Florida Statutes (2021), but it does not follow from that observation that we can wash our hands of the judicial review that is our constitutional responsibility, or that "the role of our Court and federal courts fundamentally differ when dealing with our respective administrative processes," Francis dissenting opinion at 36. Our Constitution vests the legislative power in the Florida Legislature, article III, section 1, Florida Constitution, and we have made clear that "fundamental and primary policy decisions shall be made by members of the legislature who are elected to perform those tasks," *Askew v. Cross Key Waterways*, 372 So. 2d 913, 925 (Fla. 1978). The Legislature expressly tasked us with reviewing the Commission's decisions. § 366.10. We exercise judicial review to ensure that the Commission exercised its authority in line with the Legislature's policy decisions, and the Florida Constitution. *See Askew*, 372 So. 2d at 918 ("In the final analysis it is the courts, upon a challenge to the exercise or nonexercise of administrative action, which must determine whether the administrative agency has performed consistently with the mandate of the legislature.").

based on the evidence presented by the parties. § 120.569(2)(*l*)-(m), Fla. Stat. (2021). We sustain these findings if they are supported by competent, substantial evidence in the record. § 120.68(7)(b), Fla. Stat. (2021).

Second, the Commission decides whether the settlement agreement, in light of its findings of fact, is in the public interest and results in rates that are fair, just, and reasonable. Despite what we have indicated in the past, *see, e.g.*, *Sierra Club*, 243 So. 3d at 914-15, this decision is not a pure finding of fact that we are able to review by searching for competent, substantial evidence in the record. Instead, as suggested by the qualitative words with which it is described, the Commission's decision that a settlement agreement is *in the public interest* and results in rates that are *fair*, *just*, and *reasonable* rests on both facts in the record and policy judgments guided by its "specialized knowledge and expertise in this area." *Gulf Coast Elec. Coop., Inc. v. Johnson*, 727 So. 2d 259, 262 (Fla. 1999); *see also Utilities Operating Co. v. Mayo*, 204 So. 2d 321, 324 (Fla. 1967) (the Commission's determination that "a particular rate is sufficient to produce a 'fair return' is a mixed question of law and fact."). We thus review the decision to ensure it

- 12 -

is within the range of discretion given to the Commission by the Legislature. § 120.68(7)(e)1.; *see also* § 120.68(7)(e)4.; *cf. also Island Harbor Beach Club, Ltd. v. Dep't of Nat. Res.*, 495 So. 2d 209, 218 (Fla. 1st DCA 1986) ("[A]n agency's exercise of delegated legislative authority will not be disturbed on appeal unless shown by a preponderance of the evidence to be arbitrary, capricious, or an abuse of administrative discretion.").

The Commission's decisions arrive here "with the presumption that they are reasonable and just." *W. Fla. Elec. Coop. Ass'n, Inc. v. Jacobs*, 887 So. 2d 1200, 1204 (Fla. 2004).[12] To determine whether

---

12. This presumption is no rubber stamp. "Ultimately, the Commission's actions are conditioned by statute," *Citizens of State v. Fla. Pub. Serv. Comm'n* (*Citizens I*), 146 So. 3d 1143, 1153 (Fla. 2014), and, as Justice Francis recognizes, Francis dissenting opinion at 40, we review them to ensure that they are in line with these conditions. This review requires a well-reasoned explanation, not simply a lengthy record. Our requiring of this explanation and our review of the Commission's work does no violence to the presumption; it just means the presumption is not a conclusion in presumption's clothing. Notably, even when this presumption was of statutory force, *see* section 350.12(2)(m), Florida Statutes (1975) (repealed by chapter 76-168, section 3, Laws of Florida, and chapter 81-170, section 6, Laws of Florida), we still sometimes remanded for further explanation when the Commission's orders failed to identify the factual basis for its decisions. *See, e.g., Greyhound Lines, Inc., S. Greyhound Lines Div. v. Mayo*, 207 So. 2d 1, 4-5 (Fla. 1968). *But*

- 13 -

the Commission has exercised its discretion within the range delegated to it by the Legislature, we look to the reasons given by the Commission for its decision. Were we to do otherwise, we might upset the carefully constructed constitutional and statutory process applicable here by ourselves supplying a basis for the Commission's action that the Commission, with its expertise, did not offer—in essence propelling "the court into the domain which [the Legislature] has set aside exclusively for the administrative agency." *Sec. & Exch. Comm'n v. Chenery Corp.* (*Chenery II*), 332 U.S. 194, 196 (1947); *see* § 120.68(7)(e) ("[T]he court shall not substitute its judgment for that of the agency on an issue of discretion."); Order at 2, *LULAC Fla. Educ. Fund, Inc. v. Clark*, No. SC2021-0303 (Fla. May 27, 2022) ("[I]t is not this Court's job to substitute our policy views for the Commission's."); *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) ("We may not supply a reasoned basis for the agency's action that the agency itself has not given." (citing *Chenery II*, 332 U.S. at 196)); *cf. Ryder*

---

*see Tamiami Trail Tours, Inc. v. King*, 143 So. 2d 313, 316-18 (Fla. 1962).

*Truck Lines, Inc. v. King*, 155 So. 2d 540, 541 (Fla. 1963) ("It would not be proper for this Court to delve into the transcript of the testimony 'in order to resolve opposing contentions as to what it shows or to spell out and state such conclusions of fact as it may permit.' ") (quoting *Florida v. United States*, 282 U.S. 194, 215 (1931)).

The Commission must therefore give us something to work with: a decision that is reasoned and articulated enough to allow us to assess on what basis it has concluded that the settlement agreement is in the public interest and results in rates that are fair, just, and reasonable. *See Chenery II*, 332 U.S. at 196-97 ("It will not do for a court to be compelled to guess at the theory underlying the agency's action; nor can a court be expected to chisel that which must be precise from what the agency has left vague and indecisive."); *Phelps Dodge Corp. v. NLRB*, 313 U.S. 177, 197 (1941) ("All we ask of the Board is to give clear indication that it has exercised the discretion with which Congress has empowered it."). Judicial review presupposes such an explanation. *See Citizens of State v. Graham* (*Citizens II*), 213 So. 3d 703, 711 (Fla. 2017) ("Judicial review proceedings under Section 120.68 . . . press for

[crystallization] of agency discretion.") (quoting *McDonald v. Dep't of Banking & Fin.*, 346 So. 2d 569, 583 (Fla. 1st DCA 1977)); *cf. Hardy v. City of Tarpon Springs*, 81 So. 2d 503, 506-07 (Fla. 1955), *holding modified by Pierce v. Piper Aircraft Corp.*, 279 So. 2d 281 (Fla. 1973) ("The failure to set forth a proper statement of facts precludes intelligent judicial review of this order. Not being advised what constituted the basis for the decision, any effort on our part to determine its correctness would be more guesswork.").

We have said that, while the Commission need not "resolve every issue independently" in its final order when it is reviewing a settlement agreement, it must nonetheless "discuss[] the major elements of the settlement agreement and explain[] why it [is] in the public interest." *Sierra Club*, 243 So. 3d at 914; *see Citizens I*, 146 So. 3d at 1153. That includes considering the competing arguments made by the parties below in light of the factors relevant to the Commission's decision, and supplying, given these arguments and factors, an explanation of how the evidence presented led to its decision. *See Motor Vehicle Mfrs. Ass'n of U.S., Inc.*, 463 U.S. at 43 ("[T]he agency must examine the relevant data and articulate a satisfactory explanation for its action including a

rational connection between the facts found and the choice made.") (internal quotation marks and citations omitted); *In re Permian Basin Area Rate Cases*, 390 U.S. 747, 792 (1968) ("Judicial review of the Commission's orders will . . . function accurately and efficaciously only if the Commission indicates fully and carefully the methods by which, and the purposes for which, it has chosen to act . . . ."). In other words, not only must the Commission's decision be reasonable, but it also must be "reasonably explained." *Fed. Commc'ns Comm'n v. Prometheus Radio Project*, 141 S. Ct. 1150, 1158 (2021).

## B

The Legislature has provided that the Commission, in "fixing fair, just, and reasonable rates for each customer class, . . . shall, to the extent practicable, consider the cost of providing service to the class, as well as the rate history, value of service, and experience of the public utility; the consumption and load characteristics of the various classes of customers; and public acceptance of rate structures." § 366.06(1). The Commission "shall also consider the performance of each utility pursuant to [the Florida Energy Efficiency and Conservation Act] when establishing rates for those

utilities over which the commission has ratesetting authority." §

366.82(10), Fla. Stat. (2021). A reasonably explained decision from

the Commission must reflect that those factors have been

considered to the extent practicable.

Other factors are discretionary: the Commission can consider

"the efficiency, sufficiency, and adequacy of the facilities provided

and the services rendered; the cost of providing such service and

the value of such service to the public; the ability of the utility to

improve such service and facilities; and energy conservation and

the efficient use of alternative energy resources." § 366.041(1), Fla.

Stat. (2021). And the Legislature has made clear that "it is in the

public interest to promote the development of renewable energy

resources in this state." § 366.91(1), Fla. Stat. (2021). Evidence

that these factors have been considered—where they are germane to

determining whether the settlement agreement is in the public

interest and results in rates that are fair, just, and reasonable—

permits meaningful judicial review of the Commission's

conclusions.

The Commission can also consider non-statutory factors if it

explains why they are relevant and how they relate to the

Commission's "historical and statutory role." *Sierra Club*, 243 So. 3d at 911. For example, in the order under review, the Commission supported its decision by stating that "FPL's residential 1,000 kWh bill [is] projected to remain 21% below the current national average" under the settlement agreement. Assuming that it can explain the relevance of this metric in light of "the purpose of the Commission," *id.*, the Commission can permissibly consider it in making its decision.

## C

In this case, after hearing from 60 witnesses and receiving 635 exhibits into evidence, the Commission produced an explanation of its public interest determination that spanned little more than a page. The order provides conclusory statements about the virtues of the settlement agreement, not the reasoned explanation required for our review.[13]

---

13. Justice Francis says we have jurisdiction to review the Commission's "action[s]," not its orders. Francis dissenting op. at 42. Orders of the Commission "constitute agency action" for the purposes of article V, section 3(b)(2) and section 366.10. *City Gas Co. of Fla. v. Fla. Pub. Serv. Comm'n*, 501 So. 2d 580, 581 (Fla. 1987). And the Legislature defined "agency action," as relevant here, to mean "the whole or part of a[n] . . . order." § 120.52(2), Fla. Stat. (2021). Because an agency's action "must be upheld, if at all,

- 19 -

The Commission provided no indication that it considered the statutory factors set out in sections 366.06(1) and 366.82(10). Even a cursory statement of the Commission having weighed all of these factors would be more than what we have here; our judicial review, however, requires more: a statement of the Commission's reasons for deciding as it did in light of record evidence relevant to each of these factors. *See Citizens II*, 213 So. 3d at 711 ("[T]o the extent that agency action depends on nonrule policy, Section 120.68 requires its exposition as a credential of [the agency's] expertise and experience.") (quoting *McDonald*, 346 So. 2d at 583); § 120.68(7)(e).

And while "the Commission is not required by statute or case law to address each issue of disputed fact in its final order," *Citizens I*, 146 So. 3d at 1150, or to "resolve every issue independently," *Sierra Club*, 243 So. 3d at 914, it should provide at least some written assessment of the parties' main disagreements

---

on the basis articulated by the agency itself," *Motor Vehicle Mfrs. Ass'n of U.S., Inc.*, 463 U.S. at 50, we look to the Commission's reasoning as expressed in its order, rather than try to discern it by piecing together stray remarks found in the record or appellate briefs.

reflected in the record. The Commission should explain why it reached its conclusions and how those conclusions factored into its public interest determination. Here it did not.

On appeal, the Commission and FPL assure us that the Commission's decision was warranted considering the evidence in the record. But it is not enough to point to the pile of paper memorializing these proceedings and say, "It's in there." Instead, the Commission must do the job with which the Legislature has tasked it by showing, in its final order, how the paper in that pile supports its decision. In other words, the Commission must show that its decision results from the application of its "specialized knowledge and expertise" to the facts here. *Gulf Coast Elec. Coop., Inc.*, 727 So. 2d at 262. Only then can we ensure that the Commission considered the relevant factors in light of the record evidence when it made its decision without ourselves usurping the Commission's prerogatives by offering up a basis for the decision on appeal that the Commission did not offer below. *See Cent. Truck Lines, Inc. v. King*, 146 So. 2d 370, 373 (Fla. 1962) ("Were we to uphold [the order under review], we would by such action invade the legislative field, contra to our fundamental concept of three

- 21 -

separate, distinct and independent branches of government."); *Sec. & Exch. Comm'n v. Chenery Corp.* (*Chenery I*), 318 U.S. 80, 88 (1943) ("If an order is valid only as a determination of policy or judgment which the agency alone is authorized to make and which it has not made, a judicial judgment cannot be made to do service for an administrative judgment.").

### III

In our review of final agency action, we may remand a case for further agency proceedings. *See* § 120.68(6)(a)1. On other occasions, we have recognized our authority to remand cases to the Commission when it "fail[s] to perform its duty to explain its reasoning." *Citizens II*, 213 So. 3d at 714; *see* Order at 3, *LULAC*, No. SC2021-0303. Accordingly, we remand this matter to the Commission for further proceedings consistent with our decision, including, if the Commission shall determine that the settlement agreement is in the public interest and fixes fair, just, and reasonable rates in light of the statutory factors, a consideration of the parties' main disagreements reflected in the record.[14] From the

---

14. One such disagreement is whether the SolarTogether program is unduly preferential to program participants in violation

order we have, we cannot conclude that the Commission exercised its discretion in accordance with the standards that the Legislature has provided. *See Int'l Truck & Engine Corp. v. Cap. Truck, Inc.*, 872 So. 2d 372, 374 (Fla. 1st DCA 2004) ("An agency action that is arbitrary stands outside the range of discretion delegated to the agency for purposes of review under section 120.68."); § 120.68(7)(e) (allowing for remand when an agency's exercise of discretion, among other things, was "[o]utside the range of discretion delegated to the agency by law" or "[o]therwise in violation of a constitutional or statutory provision").

Subject to any statutory requirements, the form of the proceedings on remand will be up to the Commission, including the decision whether to allow the parties to present additional evidence.

It is so ordered.

MUÑIZ, C.J., and LABARGA and GROSSHANS, JJ., concur.
CANADY, J., dissents with an opinion, in which FRANCIS, J., concurs.
FRANCIS, J., dissents with an opinion.

---

of section 366.03. Whatever the Commission ultimately decides with respect to whether the settlement agreement establishes rates that are fair, just, and reasonable, an assessment of the SolarTogether program would seem indispensable to a reasonable resolution of the issues raised by the settlement agreement, and whether it is in the public interest.

SASSO, J., did not participate.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION AND, IF FILED, DETERMINED.

CANADY, J., dissenting.

I agree with Justice Francis that remand for further proceedings is not required by the Commission's failure to provide a more expansive explanation of its decision to approve the settlement agreement. As Justice Francis explains, nothing in section 120.68, Florida Statutes (2021), or any other provision of Florida law gives this Court the authority to remand for further proceedings simply to require that the Commission elaborate on the reasons for the decision it has rendered. The majority's decision to remand here for further explanation is inconsistent with the presumption of correctness accorded orders of the Commission—which operates as "an arm of the legislative branch of government," § 350.001, Fla. Stat. (2021)—and the concomitant burden placed on challengers to establish based on the record and the law that the presumption is defeated.

The Commission's determination that the "[s]ettlement provides a reasonable resolution of all issues raised, establishes

- 24 -

rates that are fair, just and reasonable, and is in the public interest" is supported by competent, substantial evidence and has not been shown to be affected by any legal error. I therefore would affirm the Commission's final order.

FRANCIS, J., concurs.

FRANCIS, J., dissenting.

The majority opinion, in my view, expands our judicial authority over the Public Service Commission (Commission)—a legislative creature—without textual authority to do so, and in the process of so doing, invalidates an order that satisfies our current precedent. For these reasons, I respectfully dissent.

I.

Citing federal administrative precedent for much of its reasoning, majority opinion at 12-14, the majority has interpreted section 120.68 of the Florida Administrative Procedure Act (Florida APA)—titled "Judicial Review"—broadly to conclude that insufficient explanation in a Commission's order is per se absence of consideration, and thus grounds for remand.

That's a tortured reading that isn't supported by the text of section 120.68, which lays out when a court must remand a case.

In fact, far from explicitly requiring the Commission to make exhaustive written findings, the statutory procedure for rate-making only requires that the Commission *consider* the factors "to the extent practicable." § 366.06(1).[15] By choosing the word "practicable," the Legislature expressed that the Commission would have to prioritize which portions of the settlement required detailed findings and justification. *Practicable, Black's Law Dictionary* (11th ed. 2019) ("1. (Of a thing) reasonably capable of being accomplished"); *see also supra* note 15. And the Legislature declined to make the Commission's prioritization of certain factors or challenges to the settlement part of our review.

---

15. To be sure, there are circumstances in Florida administrative law where an agency exceeds the range of its discretion triggering a remand. For example, when a statute empowers an administrative agency to decide one question and the agency opines on subjects beyond that question's scope, that agency exceeds its discretion. *See, e.g., Gugelmin v. Div. of Admin. Hearings*, 815 So. 2d 764 (Fla. 4th DCA 2002) (holding that administrative law judge for the Neurological Injury Compensation Association exceeded its statutory discretion when it went beyond determining whether a claim was compensable and determined the effect of its findings upon the claimant's common law rights and remedies). This example illustrates the plain meaning of the provision the majority claims the Commission violated: an agency strays outside of its discretion when it acts on an area of law not authorized by the statute.

This is not an insignificant concern. The Legislature has struck a balance between thoroughness and expedient decision-making in the rate-making statute. That balance is reflected in the procedural deadlines the Legislature imposed on the Commission throughout chapter 366, Florida Statutes, to draft rate-making orders and adjust rates in the interim to reimburse utilities for incurred expenses. The Commission's deadlines for taking agency action under chapter 366 generally fall within 12 months, with some deadlines being much shorter.[16] A 12-month timeframe is

16. *See, e.g.,* § 366.06(3) (requiring that Commission deliver notice of withholding consent within 60 days of a utility's requested rate increase, but mandating that withholding can last no longer than 8 months; requiring that Commission take final action and enter final order within 12 months of the commencement date for final agency action; requiring that commencement date or statement of deficiencies be determined within 30 days of receipt of the utility's application); § 366.06(4) (generally requiring that Commission act within 5 months of the commencement of final agency action unless protested; if protested, requiring Commission to act within 8 months); § 366.071(2)–(3) (generally requiring that Commission act within 60 days of a requested interim rate increase or decrease); § 366.072 (requiring that rate adjustment orders be reduced to writing within 20 days).

Another example of the Legislature's balancing of practicality and expediency: the Legislature established an entire provision and docket—inaptly named the "fuel clause"—to expeditiously compensate utilities for both fuel expenses and other cost recovery methods while the rate agreement is still effective. *See, e.g., Citizens of State v. Graham* (*Citizens II*), 213 So. 3d 703, 714 (Fla.

considered by the Legislature to be an expedited timeframe in other contexts. *See, e.g.*, § 39.001(1)(h), Fla. Stat. (2023) (stating that one of the purposes of Florida's dependency system is to ensure "that no child remains in foster care longer than 1 year."); § 39.621(1), Fla. Stat. (2023) ("Time is of the essence for permanency of children in the dependency system. A permanency hearing must be held no later than 12 months after the date the child was removed from the home or within 30 days after a court determines that reasonable efforts to return a child to either parent are not required, whichever occurs first.").

By substituting its judgment for the Commission's in how to weigh what portions of the settlement deserve thorough explanation, the Court is in effect directly "substitut[ing] [its] policy views for the Commission's" as to what portions of the settlement deserved greater attention and how to balance the Legislature's

---

2017) (quoting *In re Petition by Fla. Power & Light Co. to Recover Scherer Unit 4 Turbine Upgrade Costs Through Env't Cost Recovery Clause or Fuel Cost Recovery Clause (Scherer Unit 4)*, No. PSC–11–0080–PAA–EI, at 6, 2011 WL 339538 (Fla. P.S.C. Jan. 31, 2011)). The fuel docket's purpose "is to prevent regulatory lag . . . which has historically been a problem for utilities because of the volatility of fuel costs." *Id.*

deadlines.  *See* Order at 2*, LULAC Fla. Educ. Fund, Inc. v. Clark*, No. SC2021-0303 (Fla. May 27, 2022) (remanding case to Commission); § 120.68(7)(e) ("[T]he court shall not substitute its judgment for that of the agency on an issue of discretion.").  There is no statutory or constitutional support for us to assume this role of project manager for the Commission.  Rather, "[w]e must assume that these agencies will follow the mandates of the Constitution and the laws in the discharge of their duties."  *Odham v. Foremost Dairies, Inc.*, 128 So. 2d 586, 593 (Fla. 1961).  Otherwise, our "[p]romiscuous intervention . . . in the affairs of these administrative agencies . . . w[ill] inevitably result in the dethronement of the commissions and the substitution of the courts in their place and stead."  *Id.*  I would simply affirm.

Perhaps the broad interpretation of the Florida APA is understandable when one considers that the majority relies heavily on several federal administrative law cases interpreting the federal APA's broad judicial review statute.  Majority op. at 10-15.

But the two are not the same.  Unlike the Florida APA, the federal APA expressly permits the courts broad authority to reverse arbitrary and capricious decisions where the agency fails to give

adequate explanation in its orders. *Compare* 5 U.S.C. § 706(2)(A) (2018) ("The reviewing court shall . . . (2) hold unlawful and set aside agency action, findings, and conclusions found to be-(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law"), *with* § 120.68(7)(e) (limiting our Court's judicial review of an agency's exercise of discretion to whether the order was "1. Outside the range of discretion delegated to the agency by law; 2. Inconsistent with agency rule; 3. Inconsistent with officially stated agency policy or a prior agency practice, if deviation therefrom is not explained by the agency; or 4. Otherwise in violation of a constitutional or statutory provision"). Section 120.68(7) authorizes Florida courts to set aside "actions" if it finds that the agency violates one of the specific grounds listed in subsection (7) but lacks the same catch-all language in the federal APA allowing federal courts to set aside actions "otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A); *see also* § 120.68(8) ("Unless the court finds a ground for setting aside, modifying, remanding, or ordering agency action or ancillary relief under a specified provision of this section, it shall affirm the agency's action.").

These textual differences make the majority's reliance on federal administrative law principles misplaced. Florida courts have recognized that "[s]mall definitional differences between the Florida and federal acts . . . prevent too great a reliance on federal decisions." *Dep't of Corrs. v. McCain Sales of Fla., Inc.*, 400 So. 2d 1301, 1302 (Fla. 1st DCA 1981), *superseded by* ch. 91-30, § 3, Laws of Fla.; *see also* 2 Fla. Jur. 2d *Administrative Law* § 6 (2022) ("Due to small definitional differences between the Florida Administrative Procedure Act and the analogous Federal Act, Florida courts may not place too great a reliance on federal decisions in construing the Act in particular cases." (footnotes omitted)).[17] When Florida courts have looked to federal case law for

---

17. Florida courts have also explicitly and implicitly relied on the principle that differences between the APAs prevent us from heavily relying on federal caselaw when applying parts of the Florida APA that have materially different federal counterparts. *See, e.g., Peden v. State Bd. of Funeral Dirs. and Embalmers*, 189 So. 2d 526, 527 (Fla. 3d DCA 1966) (declining to adopt the federal "substantial evidence" standard when Florida APA did not establish a standard of review for agency decisions in favor of the Florida common law rule); *State, Dep't of Env't Regul. v. Falls Chase Special Taxing Dist.*, 424 So. 2d 787, 799 (Fla. 1st DCA 1982) (Smith, C.J., dissenting) (arguing that there was neither need nor justification for supplanting Florida's firm exhaustion principle with the federal import because of Florida's "varied and abundant remedies for administrative error") (quoting *State ex rel. Dep't. of Gen. Servs. v.*

guidance on an administrative principle, they have felt the need to justify their reliance by holding that the relevant provisions amount to one another. *See Fla. Home Builders Ass'n*, 412 So. 2d at 353 n.5 ("We believe that the standing requirement of this statute is so similar to the 'substantially affected' requirement of section 120.56(1) that we are justified in looking to federal case law for guidance in formulating our rule regarding associational standing under section 120.56."). Had the Legislature wanted the Commission to address specific statutory factors in writing or face remand, it could have said so as it has in several other contexts.[18]

*Willis*, 344 So. 2d 580, 590 (Fla. 1st DCA 1977)). *But see Fla. Home Builders Ass'n v. Dep't of Labor & Emp. Sec.*, 412 So. 2d 351, 353 n.5 (Fla. 1982) (applying the federal standing rule only because both statutes recognized a form of associational standing).

18. *See, e.g.*, § 775.21(3)–(5), Fla. Stat. (2023) (expressly requiring a trial court to make written finding that an offender is a sexual predator or a sexually violent offender); § 63.089(3), (5)–(7), Fla. Stat. (2023) (expressly requiring written findings of fact in a (3) final judgment terminating parental rights, (5) dismissal order, (6) judgment terminating parental rights pending adoption, and (7) order on relief from judgment terminating parental rights); § 61.075(3), Fla. Stat. (2023) (expressly requiring written findings of fact in contested dissolution action addressing distribution of assets and liabilities); § 61.30(1)(a), Fla. Stat. (2023) (expressly requiring written findings when trier of fact orders payment of child support that varies more than five percent from guideline amounts); § 985.255(2), (3)(b), Fla. Stat. (2023) (expressly requiring written

We know this because the Legislature previously empowered this Court with the authority to remand as "seemed necessary and proper" to establish an adequate record for review, accord the parties their various rights, and to accomplish the purposes and objective of the law that initiated the administrative proceeding; the majority now claims this power absent this language. § 120.31(2)(a)-(d), Fla. Stat. (1967), *repealed by* ch. 74-310, § 4, Laws of Fla.[19]  And by extension, had the Legislature wanted to empower

findings to place juvenile offender in (2) secure detention when the risk assessment instrument reflects secure detention inappropriate or (3)(b) in more restrictive placement than the risk assessment instrument states); § 61.08(8)–(9), Fla. Stat. (2022) (expressly requiring written findings in awarding permanent alimony and in justifying exceptional circumstances for leaving payor with significantly less income than recipient); § 921.142(5), Fla. Stat. (2023) (expressly requiring written findings on aggravators and mitigators in death penalty cases).  Our Court has engaged in this type of comparative analysis before when reviewing other statutes. *See Cason v. Fla. Dep't of Mgmt. Servs.*, 944 So. 2d 306, 315 (Fla. 2006) ("In the past, we have pointed to language in other statutes to show that the Legislature 'knows how to' accomplish what it has omitted in the statute in question.") (citing *Rollins v. Pizzarelli*, 761 So. 2d 294, 298 (Fla. 2000)); *see also Pizzarelli v. Rollins,* 704 So. 2d 630, 633 (Fla. 4th DCA 1997) (looking to language in a different statute to conclude that "[w]hen the Florida Legislature wishes to provide for set-offs for future benefits it well knows how to express itself").

19.  This textual difference also undermines the majority's only historic example of our Court remanding for an insufficient

us to remand administrative orders for failing to comprehensively discuss the statutory factors, it would have said so.

But even assuming for the sake of argument there was not a significant textual difference between the federal and state APAs, we should hesitate to adopt federal administrative law principles in reviewing the Commission's order because of the structural differences between the federal and state constitutions.

At the federal level, courts are tasked with ensuring that administrative agencies—which are part of the executive branch—comply with the Legislature's requirements to properly exercise wholly legislative power. *See* Elena Kagan, *Presidential Administration*, 114 Harv. L. Rev. 2245, 2269–72 (2001) (describing

---

explanation, *Greyhound Lines, Inc., S. Greyhound Lines Div. v. Mayo*, 207 So. 2d 1, 4-5 (Fla. 1968), since the statute at the time empowered us to do so (and the orders at issue in *Greyhound Lines* lacked any factual findings). *See* majority op. at 13 note 12 (citing *Greyhound Lines*, 207 So. 2d at 4-5); *Greyhound Lines*, 207 So. 2d at 5 ("The orders here under attack were totally devoid of any factual findings. The respondent concludes that the public convenience and necessity justify its order but it fails to tell us how or why.") (relying on § 120.25(8), Fla. Stat. (1967), *repealed by* ch. 74-310, § 4, Laws of Fla.); *see also* § 120.31(2)(a)-(d), Fla. Stat. (1967), *repealed by* ch. 74-310, § 4, Laws of Fla. (authorizing broad judicial review of agency action).

federal court's role as largely enforcing the mechanisms by which federal agencies make decisions); *see also Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) ("The scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency. Nevertheless, the agency must examine the relevant data and articulate a satisfactory explanation for its action" (quoting *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962))). Yet even federal courts will "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Motor Vehicle Mfrs. Ass'n of U.S., Inc.*, 463 U.S. at 43 (quoting *Bowman Transp. Inc. v. Arkansas-Best Freight Sys.*, 419 U.S. 281, 286 (1974)).

But in Florida, the Commission is a legislative creature. § 350.001 ("The Florida Public Service Commission has been and shall continue to be an arm of the legislative branch of government."). And this Court has expressly held that the Commission is not part of the executive branch. *See Chiles v. Pub. Serv. Comm'n Nominating Council*, 573 So. 2d 829, 832 (Fla. 1991) (rejecting assertion that Commission is an entity of the executive

- 35 -

branch and finding that Commission "is an entity of the legislative branch and, as such, the legislature has the authority to establish by law how legislative branch officials, including these Public Service Commission members, may be selected").

That is why the role of our Court and federal courts fundamentally differ when dealing with our respective administrative processes. Federal courts are tasked with ensuring an executive agency is not usurping legislative power by failing to obey congressional procedures. *Motor Vehicle Mfrs. Ass'n of U.S., Inc.*, 463 U.S. at 43 ("[T]he agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.' " (quoting *Burlington Truck Lines, Inc.*, 371 U.S. at 168)). Our Court is not tasked—either by legislative request or constitutional structure—with the same need to provide oversight and maintain compliance to prevent executive overreach. Rather, our role—as defined by statute and our constitutional system—is to verify that the Commission does not stray outside the bounds of its defined authority as the Legislature's rate-making body. *See Odham*, 128 So. 2d at 592-93 ("The courts have been extremely reluctant to

interfere with the actions of such bodies in the proper performance of their duties and responsibilities in the absence of a ***clear and unmistakably flagrant violation*** of a constitutional or statutory right of the affected party.") (emphasis added).  Because we do not act as a neutral arbiter between two co-extensive branches of government in our scheme, we should recognize that federal administrative principles do not fit the Florida administrative law system.[20]

---

20.  The majority expresses an understandable concern that our Court would be abdicating a core judicial responsibility by not remanding this order.  *See* majority op. at 11 note 11 ("Our dissenting colleagues are correct that the Commission is an 'arm of the legislative branch of government,' . . . but it does not follow from that observation that we can wash our hands of the judicial review that is our constitutional responsibility . . . .").  But respectfully, the bounds of our constitutional responsibility are established by the Florida Constitution's text and the Legislature's stated scope of review.  Nowhere in the Constitution nor in the phrase "[o]utside the range of discretion delegated to the agency by law" is the power to remand for an unsatisfyingly terse order.  § 120.68(7)(e).  Our Legislature's choice to curtail our authority in the judicial review statute nearly fifty years ago undermines this sullying of our hands by plowing the deeply rooted balance the Legislature has established in the face of textual evidence to the contrary.  § 120.31, Fla. Stat. (1967), *repealed by* ch. 74-310, § 4, Laws of Fla.

Instead, it appears to me that with today's opinion, the majority has imposed additional requirements on the Legislature's own subordinate body, becoming, in essence, the Commission's project manager. In doing so, the majority upsets a legislatively weighed balance between detail and expediency set out in the Commission's authorizing statute and the Florida APA. *See* § 366.06(1) (requiring that the Commission **consider** the factors in the statute "to the extent practicable") (emphasis added); *see also* § 120.569(2)(m) (requiring that findings of fact "be accompanied by a concise and explicit statement of the underlying facts of record which support the findings"). The majority's efforts are not made in service to the language of some constitutional or statutory command, but to ease the troublesomeness on our review. *See* art. V, § 3(b)(2), Fla. Const. (limiting our jurisdiction to review "action of statewide agencies relating to rates or service of utilities providing electric, gas, or telephone service" to that provided by the Legislature through general law); *see also Ocala Breeders' Sales Co., Inc. v. Fla. Gaming Ctrs., Inc.*, 731 So. 2d 21, 25 (Fla. 1st DCA 1999), *aff'd,* 793 So. 2d 899 (Fla. 2001) ("The legislature has broad

discretion to establish statutory classification schemes in general laws.").

Stepping into the Legislature's province demands far more constitutional support than the majority provides.

In short, neither party challenging this order can show the Commission departed from the Florida APA's essential requirements.[21] The majority's claim of authority to remand on these grounds rests on federal principles that overlook the significant textual and conceptual differences between the federal and Florida administrative states. Remanding here is an unwise incursion into the Legislature's role to mandate standards for the Commission and supervise the rate-making process.

---

21. Even if the majority is in effect abrogating the rule that agencies need not discuss every statutory factor and all contested issues in orders on settlements—a reversal brought on in part by the majority's overly broad understanding of review—we should be more transparent about the novelty of our demand. *See Sierra Club v. Brown,* 243 So. 3d 903, 912 (Fla. 2018) (holding that requiring the Commission to expound on every issue "would convert a short order into a boundless tome, despite the fact that the Commission found the settlement agreement to be in the public interest—a finding . . . afford[ed] great deference."). Otherwise, we subject the Commission to a perpetual Sisyphean fate of rolling its orders up our hill praying that it has complied with our previously stated standard, only for us to roll its order back down on remand.

Finally, our precedent cloaks the Commission's orders with a presumption of correctness and an assumption that the agency *considered* all relevant statutory factors—absent evidence to the contrary. *See W. Fla. Elec. Coop. Ass'n, Inc. v. Jacobs*, 887 So. 2d 1200, 1204 (Fla. 2004) ("Commission orders come to this Court clothed with the presumption that they are reasonable and just."). "To overcome these presumptions, a party challenging an order of the Commission on appeal has the burden of showing a departure from the essential requirements of law and the legislation controlling the issue, or that the findings of the Commission are not supported by competent, substantial evidence." *S. All. for Clean Energy v. Graham*, 113 So. 3d 742, 752 (Fla. 2013) (quoting *Crist v. Jaber*, 908 So. 2d 426, 430 (Fla. 2005)).[22]

In concluding that the Commission unlawfully exceeded its discretion, the majority focuses on the Commission's failure to

---

22. I agree with the majority that this presumption of validity does not accord the Commission a "rubber stamp" from the Legislature or this Court. Majority op. at 13 note 12. I disagree, however, with my respected colleagues that finding the Commission's order violated the APA is within the conditions defined by statute. As I stated before, the Legislature has curtailed

discuss two of the enumerated statutory factors provided in the statute. *See* majority op. at 20 (citing §§ 366.06(1), 366.82(10)); *see also* § 120.68(7)(e) (providing that a court may remand an agency order when "[t]he agency's exercise of discretion was: 1. Outside the range of discretion delegated to the agency by law"). Embedded throughout the majority's opinion is an implicit dissatisfaction with the order's terseness. I get it.[23]

the scope of our review of agency orders over the past fifty years. *See supra* note 20 and accompanying text. Remanding to force the Commission to produce a more comprehensive order than demanded by law vitiates the presumption of consideration—it unfairly punishes the agency for failing to guess that more is required of it than law or precedent demand. *See supra* note 20. Put another way, how are we fairly presuming the Commission's order was valid when the agency is unaware that we employ stricter standards than those demanded by statute or precedent? The Commission can only rely on the statutory language and our precedents interpreting that language.

23. Though, one could argue that the Commission's decision to spend most of its order focusing on statutory support for various parts of the settlement was a rational response to Appellants' arguments before the Commission. Appellants challenged the Commission's statutory authority to approve a variety of cost recovery mechanisms in the proposed settlement. *See* majority op. at 2 note 2 (detailing the various challenges to the Commission's statutory authority that the majority rejects as meritless). If this Court had found any of those arguments persuasive (the majority did not, *see* majority opinion at 2 note 2), major elements of the settlement would have been invalidated as beyond the scope of the Commission's discretion. *See, e.g., supra* note 15. It is possible the

But article V, section 3(b)(2) gives us jurisdiction to review agency "action." *See also* § 366.10. Though the agency's "action" is memorialized by an order, we are at bottom reviewing what the agency *does*, not how detailed its order is. To do otherwise is simply elevating form over substance.[24]

Commission assessed the threat of losing authority to properly reimburse utilities for grid improvements as a grave threat to the proper functioning of the Florida utility system. This threat was also heightened since the Commission recently lost any deference to its interpretation of its statutory authority, as reflected in the Appellants' argument here. *See* art. V, § 21, Fla. Const. (eff. Nov. 6, 2018).

24. The majority characterizes this portion of my opinion as defining the Court's jurisdiction "to review the Commission's 'action[s],' *not* its orders." Majority op. at 19 note 13 (emphasis added). This is simply a misreading of the text above. Recognizing our review touches not just the text of the written order but also how the agency arrived at that order does not *exclude* orders from our review. And clearly, we do not review an order alone to determine whether an agency has complied with the statute; else the Legislature would have used "agency action" rather than "exercise of discretion" when authorizing us to remand agency action. *See* § 120.68(7)(e) ("(7) The court shall remand a case to the agency for further proceedings . . . when it finds that: (e) *The agency's exercise of discretion* was 1. Outside the range of discretion delegated to the agency by law.") (emphasis added)). Nor would the Florida APA have included reviewing whether hearings were held before final agency action; whether the action was supported by competent, substantial evidence during hearings; whether the fairness of the proceeding was impaired by a material error; or whether the agency misinterpreted law that compelled a particular

And the failure to discuss these two factors does not translate to the Commission failing to *consider* the relevant statutory factors sufficient to impair "[t]he fairness of the proceedings or the correctness of the action" below. § 120.68(7)(c); *see also* § 366.06(1) (requiring the Commission's consideration "to the extent practicable"); *Consider, Webster's Third New International Dictionary* (1966 ed.) ("1. to reflect on: think about with a degree of care or caution . . . 2. to think of, regard, or treat in an attentive, solicitous, or kindly way . . . 4. to think of: come to view, judge, or classify.").[25]

To the contrary, the Commission's consideration of all the statutory factors was shown by the admission of extensive evidence during the administrative process, and discussion of most statutory factors in its order. And FPL pointed to the record evidence in this appeal proving the settlement was in the public interest. Although

---

action if the order was the sole concern of the Legislature. *See* § 120.68(7)(a)-(e).

25. Perhaps the Commission would have to provide a more thorough order were we reviewing the Commission's interpretation of a rule or statute de novo under article V, section 21 of the Florida Constitution. But it is clear the Commission's order is entitled to deference based on well-settled law. *Jacobs,* 887 So. 2d at 1204; *Odham,* 128 So. 2d at 592-93.

the portion of the order discussing the public interest is terse, the nearly 70,000 pages of record evidence establishes that the Commission thoroughly considered considerable information in coming to its decision that the factors justified the settlement order.

Indeed, this order resembles orders this Court affirmed in *Citizens I* and *Sierra Club*; if anything, the Commission's order here provides more of an explanation as to why it considers the settlement to be in the public interest. *Citizens of State v. Fla. Pub. Serv. Comm'n* (*Citizens I*), 146 So. 3d 1143, 1153 (Fla. 2014) (discussing the Commission's final order and quoting fewer than 200 words of findings); *Sierra Club*, 243 So. 3d at 914 (affirming the final order because the order "discussed the major elements of the settlement agreement and explained why it was in the public interest" without further analysis or discussion of the order). Even the order at issue in *LULAC*, where we remanded for additional explanation, failed to meaningfully discuss the main challenge to the sole program at issue in that case (Clean Energy Connection) rather than a comprehensive rate setting order like the one here. Order at 1-3, *LULAC*, No. SC2021-0303.

By all the benchmarks established by our case law and the statute, the agency provided enough support and explanation for us to review the settlement and determine that the proceeding was fair and the order correct.  § 120.68(7)(c).  I therefore fail to see how remanding this matter will enable more meaningful review than the record already before us.

Further, we are to affirm "[u]nless the court finds a ground for setting aside, modifying, remanding, or ordering agency action or ancillary relief ***under a specified provision of this section . . . .***" § 120.68(8) (emphasis added).  Remanding because an order lacks our unclear preferred amount of detail doesn't satisfy this statutory mandate.

I respectfully dissent.

An Appeal from the Florida Public Service Commission

John Thomas LaVia, III and Robert Scheffel Wright of Gardner, Bist, Bowden, Dee, LaVia, Wright, Perry & Harper, P.A., Tallahassee, Florida,

for Appellant Floridians Against Increased Rates, Inc.

Bradley Marshall and Jordan Luebkemann of Earthjustice, Tallahassee, Florida,

for Appellants Florida Rising, League of United Latin American Citizens, and Environmental Confederation of Southwest Florida

Keith C. Hetrick, General Counsel, Samantha M. Cibula, Attorney Supervisor, and Douglas D. Sunshine, Senior Attorney, Florida Public Service Commission, Tallahassee, Florida,

for Appellee Florida Public Service Commission

Stuart Singer and Pascual A. Oliu of Boies Schiller Flexner LLP, Fort Lauderdale, Florida; Jason Gonzalez and Amber Stoner Nunnally of Lawson, Huck, Gonzalez, PLLC, Tallahassee, Florida; Daniel E. Nordby of Shutts & Bowen LLP, Tallahassee, Florida; and John T. Burnett, Maria Jose Moncada, and Joel Baker of Florida Power & Light Company, Juno Beach, Florida,

for Appellee Florida Power & Light Company